[No. E034875. Fourth Dist., Div. Two. May 11, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
FELIX MICHAEL ANGULO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A.4., II.B.1.–5., II.C.–F.

## COUNSEL

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Meagan J. Beale and Kyle Niki Shaffer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, Acting P. J.**—Felix Michael Angulo appeals from an order committing him to a secured facility after a jury found him to be a sexually violent predator pursuant to the Sexually Violent Predator Act. (SVPA; Welf. & Inst. Code, § 6600 et seq.) We affirm the order.

I

### FACTUAL AND PROCEDURAL BACKGROUND

A. *First Prior Petition—1998*

In April 1998, the District Attorney of Riverside County petitioned for an order pursuant to the SVPA committing Angulo to the State Department of Mental Health (Department) as a sexually violent predator (SVP). The court found probable cause to believe Angulo was an SVP and set the matter for trial.[1] In August 1998, Angulo admitted the allegations of the petition, and the court committed him to the Department for confinement at Atascadero State Hospital (ASH) for two years.

B. *Second Prior Petition—2000*

In May 2000, the district attorney petitioned for an order extending Angulo's commitment. Angulo again admitted he was an SVP, and the court again ordered him committed to the Department for two years.

---

[1] See Welfare and Institutions Code section 6602.

### C. *Current Petition—2002*

In June 2002, the district attorney again petitioned for an order extending Angulo's commitment. The court found probable cause and in August 2003 set the matter for trial.

The trial, before a jury, took place in November 2003. Presentation of evidence took five days. The jury found Angulo to be an SVP within the meaning of Welfare and Institutions Code section 6600. The court ordered that Angulo be recommitted to the Department for two years for appropriate treatment in a secured facility.

### D. *Trial Testimony*

Most of the testimony at trial came from the People's and Angulo's expert psychologists.

#### 1. *Dr. Scherrer*

Dr. Mark Scherrer, a clinical psychologist working for ASH, testified for the People. Dr. Scherrer first evaluated Angulo in 2000. He evaluated Angulo again in May 2002 in connection with this case. Before making the evaluation, he tried to interview Angulo, but Angulo would not agree, because the interview was not going to be tape-recorded. In July 2003, Dr. Scherrer again tried to interview Angulo, this time with the interview to be tape-recorded. Angulo again refused.

##### a. *Arkansas convictions—1986*

Dr. Scherrer's review of the documents pertaining to Angulo's case showed that in 1986 Angulo had been convicted in Arkansas of sexually molesting a seven-year-old girl and a 10-year-old boy. Angulo had been living with the children's family for some time when he committed the molestations.

The boy in the Arkansas matter said Angulo had several times placed his penis in the boy's rectum. The girl said Angulo would come to her when she was sleeping, take her into his room, and place his penis between her legs. Angulo was convicted of first degree carnal abuse and first degree sexual abuse and received six years in prison. The comparable California offenses would be sodomy and commission of a lewd and lascivious act on a child.

##### b. *Riverside conviction—1992*

Dr. Scherrer's review further showed that in November 1992, Angulo pled guilty in the Riverside Superior Court to committing a lewd and lascivious

act on a child in September 1992. The child was the four-year-old daughter of a woman with whom Angulo was living at the time. Angulo received six years in prison. We set forth additional details of the Riverside offense later in this opinion.

### c. *Other criminal activity*

Dr. Scherrer also noted that in May 1990 Angulo was convicted of burglary after he entered the residence of two men, got in bed with one of them, and put his hand on the man's penis. Angulo left the room when the man woke up, but when the man went back to his bedroom, he found Angulo in the bed, naked. Angulo left the residence, but when he was later detained he had in his possession a ring taken from the residence.

Angulo's records also showed a history of illegal drug use. There was an indication he may have been under the influence of drugs at the time of the Arkansas crimes. In addition, Angulo told a counselor his drug use had contributed to the behavior that led to the 1990 burglary conviction.

### d. *Angulo's mental condition*

Dr. Scherrer noted that in June 2000, a psychiatrist at ASH diagnosed Angulo as suffering from nonexclusive pedophilia with attraction to males and females, as well as multiple substance abuse disorders. Pedophilia is a sexual deviancy characterized by intense recurrent fantasies, urges, or behaviors of sexual activity with children, generally 13 years old or younger. Nonexclusive means that the pedophiliac is attracted to adults as well as children. Pedophilia is a chronic lifelong disorder.

Dr. Scherrer concurred in the diagnosis of pedophilia. He also diagnosed Angulo as having a personality disorder characterized by antisocial behavior such as lack of regard for the rights of others, lack of remorse, lying, and manipulation. In addition, Angulo's continued commission of criminal acts after he was incarcerated showed he did not have the ability to control his behavior.

Based on Angulo's prior sex offenses, the character of his victims, his age, and other factors, Dr. Scherrer concluded Angulo had a medium-high risk of sexual offending. He fell into the second highest category on a risk assessment scale. Persons in that category of Angulo's age (44) have been shown to have a 40 percent risk of being convicted for reoffending within 15 years. That figure understates the actual probability of reoffending, because not all reoffenders are caught and convicted.

Dr. Scherrer thought Angulo's risk of reoffending was increased due to certain empirical factors that had been shown to correlate with a high level of reoffending: his personality disorder, his pedophilia, the death of his mother in his infancy, his commission of crimes in addition to the sexual offenses, and the number of his victims. These empirical factors related to past events and would not change over time. In addition, Angulo exhibited certain dynamic factors that increased his risk of reoffending, but that might change: his substance abuse and his failure to pursue any of his treatment programs seriously.

Based on his review, Dr. Scherrer concluded Angulo met the criteria of the SVP law. Dr. Scherrer saw no evidence of significant psychological, emotional, or behavioral change in Angulo that would override his documented history of sexual offenses.

### 2. *Dr. Starr*

Dr. Dawn Starr, a psychologist in private practice, also testified for the People. Angulo refused to speak with her, and she, like Dr. Scherrer, based her evaluation of him on his records.

Dr. Starr for the most part concurred in Dr. Scherrer's evaluation. She testified Angulo's Arkansas and Riverside convictions qualified as sexual violent crimes involving substantial sexual conduct. She also testified Angulo suffered from paraphilia, specifically pedophilia, with deviant sexual interests or urges involving children and nonconsenting individuals. Finally, she testified Angulo had committed, and was likely to commit in the future, sexually violent predatory offenses.

### 3. *Dr. Kania*

At Angulo's request, the court appointed Dr. Michael Kania, a psychologist, to evaluate Angulo. Dr. Kania reviewed the police reports from the Arkansas cases and the 1992 California case, as well as previous evaluations of Angulo. He testified for the defense and stated Angulo was unlikely to commit predatory sexual offenses in the future, based on his assessment that Angulo's past offenses had not been predatory.

Dr. Kania noted that in the Arkansas cases, Angulo had been living with the victims' family for a long time before he committed the offenses. He had first lived with the family when his girlfriend also lived there, and she had introduced him to the family. There was no indication Angulo had moved into the residence because he wanted to molest the children, as would be the case with a predatory molestation. The molestations occurred after Angulo had

broken up with his girlfriend, when he was experiencing emotional turmoil and confusion about his own sexuality.

With respect to the Riverside offense, Dr. Kania noted that again, Angulo had had a relationship with his girlfriend for a number of years, and had lived with her and her child, before he molested the child. Also, there was no indication he had molested any of his girlfriend's older children, even though he had lived with them as well.

In general, Dr. Kania noted that Angulo did not begin committing sexual offenses until he was an adult, which suggested his disorder was not as deeply entrenched as it would have been had he begun earlier. His last sexual offense had been 11 or 12 years earlier, suggesting his sexual drive was now decreased. Neither his sexual fantasies as a teenager nor his adult fantasies had involved children.

Also, Angulo had established extended relationships (i.e., a year or so) with both women and men, indicating his primary sexual attraction was not to children. In addition, there was no indication Angulo had been molested as a child, which is common among people who are sexually attracted to children. According to Angulo, his primary sexual attraction was now to adult males. Angulo seemed to Dr. Kania to be ashamed of his prior sexual offenses. However, he did not want to admit he had a problem. For that reason, he did not have much motivation to receive treatment.

Dr. Kania agreed that the Arkansas offenses were sexually violent, in that there was force involved. There was also force used in the Riverside molestation, and substantial sexual conduct.

Dr. Kania also agreed that Angulo suffered from a diagnosed medical disorder, i.e., nonexclusive pedophilia. In addition, he agreed Angulo was likely to engage in sexually violent criminal behavior as a result of his disorder. Based on Angulo's history, Dr. Kania believed that if his adult sexual relationships ended in a dramatic way, he was likely to turn to children.

### 4. *Other defense witnesses*

Angulo also presented testimony of three ASH employees to the effect that, as far as they knew, his behavior in custody there was good for the most part.

## II

## DISCUSSION

### A. Denial of Confidential Court-appointed Experts

Before trial, Angulo requested that the court appoint one or more mental health care professionals to assist in his defense. Angulo also moved that any court-appointed psychological evaluations performed at his request be kept confidential from disclosure to the People. The court appointed Dr. Kania to serve as a defense expert but denied Angulo's request for confidentiality.

Angulo contends the court's refusal to order confidential evaluations violated his federal constitutional rights to assistance of counsel, to present a defense, and to a fair trial under the federal Constitution. He also contends he was entitled to confidential evaluations by virtue of the psychotherapist-patient privilege, the lawyer-client privilege, the work product doctrine, and the privilege against self-incrimination.

#### 1. Appointment of experts in SVP cases

Angulo, an indigent, was represented by the public defender throughout this proceeding. The SVPA expressly authorizes the appointment of experts for indigent litigants. Welfare and Institutions Code section 6603, subdivision (a) (Welfare and Institutions Code section 6603(a)) states in relevant part: "In the case of a person who is indigent, the court shall appoint counsel to assist him or her, and, upon the person's request, assist the person in obtaining an expert or professional person to perform an examination or participate in the trial on the person's behalf."

By granting an SVP the right to appointment of an expert to perform an examination "or" participate in the trial, Welfare and Institutions Code section 6603(a) suggests that an appointed expert may not necessarily testify at trial. Under the Civil Discovery Act (Code Civ. Proc., § 2016 et seq.), opinions of nontestifying experts are not discoverable unless the opposing party shows that fairness requires disclosure. (Code Civ. Proc., § 2018, subd. (b); *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 297 [4 Cal.Rptr.3d 883].) The Civil Discovery Act applies to SVPA proceedings. (*Leake v. Superior Court* (2001) 87 Cal.App.4th 675, 679 [104 Cal.Rptr.2d 767]; *People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 996 [114 Cal.Rptr.2d 760].)

Arguably, then, an SVPA defendant could obtain a confidential expert evaluation and, based on the expert's conclusions, keep the evaluation

confidential unless the expert testified or disclosure was necessary to insure fairness. The defendant could then decide whether to have the expert testify, call a different expert to testify, or defend the case without an expert witness. That is, in fact, what defense counsel in this case sought to do; she stated: "Upon receipt of the evaluation(s) I will determine whether it is to respondent's tactical advantage to call the evaluator(s) as (a) witness(es) and will use the evaluation(s) in preparation for trial in such fashion as seems most appropriate."

 The question here, however, is not whether an alleged SVP *could* obtain a confidential evaluation from a nontestifying expert, but whether a trial court in an SVPA proceeding is *required* to give an indigent defendant that same option. Both the United States and California Supreme Courts have rejected the proposition "that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy . . . " (*Ake v. Oklahoma* (1985) 470 U.S. 68, 77 [84 L.Ed.2d 53, 105 S.Ct. 1087] (*Ake*); accord, *People v. Jackson* (1980) 28 Cal.3d 264, 287 [168 Cal.Rptr. 603, 618 P.2d 149] [rejecting "the unsupported assumption that any advantage which is available to the wealthy defendant must, of constitutional necessity, be extended to an impecunious one"], disapproved on another point in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Instead, the states' obligation is to afford indigents " 'an adequate opportunity to present their claims fairly within the adversary system' " by providing them with "the 'basic tools of an adequate defense or appeal.' " (*Ake*, at p. 77.) We therefore must consider whether, under the circumstances of this case, a confidential expert evaluation is such a basic tool.

### 2. *Constitutional Rights*

In arguing that the court's denial of confidential evaluations violated his constitutional rights to assistance of counsel, to present a defense, and to a fair trial, Angulo relies on two decisions of the United States Supreme Court and two decisions of our own Supreme Court. In *Ake, supra,* 470 U.S. 68, 74, the court held "that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." In *Little v. Streater* (1981) 452 U.S. 1, 10, 16–17 [68 L.Ed.2d 627, 101 S.Ct. 2202] (*Streater*), the court held that under the due process clause, an indigent putative father in a paternity suit is entitled to a blood test paid for by the state, even though the proceeding is "quasi-criminal" rather than criminal.

The California Supreme Court similarly held in *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307 [204 Cal.Rptr. 165, 682 P.2d 360] that a criminal

defendant's right to effective assistance of counsel "also includes the right to reasonably necessary ancillary defense services. [Citations.]" (*Id.* at p. 319.) In *People v. Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373] (*Feagley*), the court held that a defendant charged with being a mentally disordered sex offender (see former Welf. & Inst. Code, § 6300 et seq.) is constitutionally entitled to proof beyond a reasonable doubt and a unanimous verdict. (*Feagley*, at pp. 345, 349–352.)

■ These cases do not support Angulo's contention that an indigent SVP has a constitutional right to a *confidential* evaluation by an appointed expert. Preliminarily, it should be noted that both *Ake* and *Coronevsky* were criminal prosecutions. As we discuss more fully in part II.A.3 of this opinion, an SVPA proceeding "is a civil proceeding," though it has "many of the trappings of a criminal proceeding." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1192 [124 Cal.Rptr.2d 186, 52 P.3d 116].) Hence, it cannot necessarily be presumed that a constitutional right recognized in the context of a criminal proceeding applies wholesale to an SVPA proceeding.

More fundamentally, none of the decisions Angulo cites said anything to suggest that *confidential* expert assistance is constitutionally required. *Feagley* did not involve the right to expert assistance at all; it dealt with jury unanimity and the standard of proof. *Corenevsky* involved a defendant's request for a jury selection expert and law clerks, individuals who, unlike court-appointed psychologists, do not generate relevant factual evidence. Thus, no issue of discovery, or confidentiality, arose.

*Ake* and *Streater* did concern expert assistance that would generate relevant evidence. However, the Supreme Court in each case assumed that the evidence generated would *not* be confidential, because the expert would testify at trial. The court in *Ake* made numerous statements to that effect: "[P]sychiatrists gather facts . . . that they will *share with the judge or jury* . . ." (*Ake, supra,* 470 U.S. 68, 80, italics added); "psychiatrists can . . . *tell the jury* why their observations are relevant" (*ibid.,* italics added); "psychiatrists can translate a medical diagnosis into language that will assist the trier of fact" (*ibid.,* italics added); "[t]hrough this process of investigation, interpretation, and *testimony,* psychiatrists ideally *assist lay jurors*" (*id.* at pp. 80–81, italics added); "the *testimony* of psychiatrists can be crucial" (*id.* at p. 81, italics added); "the psychiatrists for each party enable the *jury* to make its most accurate determination of the truth on the issue before them" (*ibid,* italics added).

The court in *Streater* similarly stated: "Among the most probative additional *evidence the defendant might offer* are the results of blood grouping tests, but if he is indigent, the State essentially denies him that reliable

scientific *proof* by requiring that he bear its cost. [Citation.]" (*Streater, supra,* 452 U.S. 1, 12, italics added.)

■ Further, the court in *Ake* predicated its finding of a right to expert assistance on a criminal defendant's right to "a fair opportunity to present his defense," a right which the court stated was "grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness . . . ." (*Ake, supra,* 470 U.S. 68, 76.) The court in *Streater,* too, based its holding on "the command of the Due Process Clause." (*Streater, supra,* 452 U.S. 1, 12.) The court recognized that "[d]ue process, 'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' [Citation.] Rather, it is 'flexible and calls for such procedural protections as the particular situation demands.' [Citation.]" (*Id.* at p. 5.)

■ The *Streater* court further explained that under the test articulated in *Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 96 S.Ct. 893, 903], a court in deciding whether due process requires a particular procedure must consider " 'three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*Streater, supra,* 452 U.S. 1, 6.) Notably, the court has applied that test in determining the rights that must be afforded a defendant in a civil commitment proceeding. (*Addington v. Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804] [standard of proof for civil commitment]; see also *Medina v. California* (1992) 505 U.S. 437, 444 [120 L.Ed.2d 353, 112 S.Ct. 2572] [noting use of test in civil commitment context].)

■ Applying that analysis here leads to the conclusion that an indigent SVP's right to a court-appointed psychologist or psychiatrist does not include the right to a confidential evaluation. The first factor, an SVP's liberty interest, is of compelling importance, but it does not weigh in favor of a confidential evaluation. Due process in an SVPA proceeding is satisfied where "the defendant has the opportunity to thoroughly present his side of the story." (*People v. Superior Court (Howard)* (1999) 70 Cal.App.4th 136, 154 [82 Cal.Rptr.2d 481].) A psychological evaluation only serves the defendant's right to "present his side of the story" if the results are made available to the jury. In that event, of course, the evaluation is not confidential.

The second factor, the risk of an erroneous deprivation of the defendant's liberty interest, weighs heavily against a right to a confidential evaluation. If

anything, an erroneous result is *more* likely with a confidential evaluation, because the jury will hear less of the available relevant evidence. That consideration carries particular weight in this case. Dr. Kania was the only psychologist to whom Angulo would talk, and defense counsel specifically requested that he be appointed. Thus, the court could reasonably conclude Dr. Kania was likely to gain access to evidence to which the People and the jury would have no access if Angulo's request for confidentiality were granted.

The third factor, the fiscal and administrative burdens that the right claimed by the defendant would entail, also weighs against a confidential evaluation. If Angulo elected to keep the evaluation confidential, the court would either have to require him to proceed without an expert witness—exactly the situation Welfare and Institutions Code section 6603(a) is designed to avoid, and one that might itself raise due process concerns—or appoint at least one, and possibly more, additional experts until Angulo received an evaluation he liked well enough to present to the jury.

The Supreme Court in *Ake* made clear that there is no right to more than one appointed mental health expert and no right to a favorable evaluation. The court stated that "the obligation of the State is limited to provision of *one* competent psychiatrist . . . ." (*Ake, supra,* 470 U.S. 68, 79, italics added.) It also stated that recognizing a right to an appointed psychiatrist "is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking . . . [W]e leave to the State the decision on how to implement this right." (*Id.* at p. 83.)

Our own Supreme Court has reached the same conclusions. In *People v. Panah* (2005) 35 Cal.4th 395 [25 Cal.Rptr.3d 672, 107 P.3d 790], a capital defendant "refus[ed] to cooperate" with the prosecution and defense psychiatrists appointed by the court, and requested a third mental health expert. The Supreme Court held the request was properly denied: " 'Neither *Ake* [citation] . . . nor the broader rule guaranteeing court-appointed experts necessary for the preparation of a defense [citation], gives rise to a federal constitutional right to the *effective* assistance of a mental health expert.' [Citation.]" (*Id.* at p. 436, italics added, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 838 [64 Cal.Rptr.2d 400, 938 P.2d 2].) The court in *Samayoa* similarly held that as long as the defendant receives expert assistance, "[t]he circumstance that these witnesses did not provide testimony at defendant's trial which in defendant's view persuasively supported his defense . . . does not give rise to a claim of a violation of a federal constitutional safeguard. [Citation.]" (*Samayoa,* at pp. 838–839.)

Finally, the *Ake* court recognized that the purpose of requiring court-appointed experts is to "assure a proper functioning of the adversary process . . . ." (*Ake, supra,* 470 U.S. 68, 77.) Providing Angulo with confidential

evaluations would *impair* the functioning of the adversary process by giving the defense a distinct advantage over the prosecution. To file an SVPA proceeding, the Department had to obtain at least two expert opinions that Angulo was an SVP. The Department could consult a total of four experts to obtain the required evaluations. (Welf. & Inst. Code, § 6601, subds. (d)–(h).)

■ Nothing in the SVPA permitted the district attorney to keep any of those evaluations confidential. To the contrary, the SVPA provides that an alleged SVP is entitled "to have access to all relevant medical and psychological records and reports." (Welf. & Inst. Code, § 6603(a), italics added.) Accordingly, the offender has access to any dissenting report when the Department is obliged to consult more than two experts. Yet if the offender had the right to confidential evaluations as Angulo proposes, the prosecution would have no reciprocal right of access and in cases like this one would be relegated to relying on secondhand evaluations even though a firsthand evaluation existed. Such a result undermines not only the adversary process but also the reliability of the entire proceeding.

For these reasons, we conclude Angulo had no constitutional right to confidential expert evaluations. We now consider Angulo's claim that he had such a right under various evidentiary privileges.

### 3. *Psychotherapist-patient privilege*

The psychotherapist-patient privilege is set forth in Evidence Code section 1014.[2] That section provides in relevant part that a patient "has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ."

■ Section 1017 creates an exception to the psychotherapist-patient privilege, stating: "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant *in a criminal proceeding* in order to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition." (*Id.*, subd. (a), italics added.)

We are not aware of any authority directly addressing whether section 1017 allows an alleged SVP to claim the psychotherapist-patient privilege for evaluations performed by court-appointed experts. The People cite *People v.*

---

[2] Undesignated statutory references are to the Evidence Code.

*Martinez* (2001) 88 Cal.App.4th 465 [105 Cal.Rptr.2d 841] for the proposition that the privilege does not attach to an expert appointed to evaluate a person alleged to be an SVP. However, there is no indication in *Martinez* that the expert was appointed "upon the request of the lawyer for the defendant" (§ 1017, subd. (a)), as would have been necessary for the privilege to attach under section 1017. (*Martinez*, at p. 484.)

Here, defense counsel *requested* appointment of an expert. The question, therefore, is whether an SVPA case should be considered a "criminal proceeding" for purposes of the exception to section 1017.

In *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*), the United States Supreme Court held that a proceeding under the Kansas sexually violent predator act was not a criminal matter for purposes of the constitutional prohibitions on double jeopardy and ex post facto lawmaking. The provisions of the Kansas act in *Hendricks* were virtually identical to those of California's SVPA. Like the California act, the Kansas act provided for appointment of counsel and experts for indigent parties, a 12-person jury trial, and proof beyond a reasonable doubt. (Kan. Stats. Ann. § 59-29a06(b).)

The *Hendricks* court nonetheless held that confinement under the act did not constitute punishment. Hence, the act was civil in nature, and confinement based on an offender's past commission of predicate offenses did not violate the double jeopardy and ex post facto protections. (*Hendricks, supra,* 521 U.S. 346, 370–371.)

The *Hendricks* court stated that in determining whether a particular proceeding is civil or criminal, "we ordinarily defer to the legislature's stated intent." (*Hendricks, supra,* 521 U.S. 346, 361.) The court determined the intent of the Kansas Legislature was to establish civil proceedings, citing the facts that the legislature placed the act in the probate code, not the criminal code; the legislature described the act as creating a "civil commitment" procedure; the act was not retributive, because it did not "affix culpability for prior criminal conduct" but used the conduct "solely for evidentiary purposes"; no finding of scienter was required to commit an individual found to be an SVP; the act was not intended to function as a deterrent, because persons suffering from mental disorders were "unlikely to be deterred by the threat of confinement"; persons confined under the act were not subject to the restrictions placed on prisoners; the confinement was limited to one year and could only be renewed with a new showing that the individual still met the criteria for confinement; the act permitted immediate release upon a showing that the individual was no longer dangerous; and treatment of the individual

confined was "at least an ancillary goal of the Act, which easily satisfies any test for determining that the Act is not punitive." (*Id.* at pp. 361–368 & fn. 5.)

With the exception that an SVPA commitment is for two years, all of these attributes are shared by the SVPA. In recognition of that fact, the California Supreme Court has repeatedly described the SVPA as civil in nature. The court in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584] noted that in *Hendricks*, "[t]he high court found that the Kansas Legislature intended a nonpenal 'civil commitment scheme designed to protect the public from harm.' [Citation.]" (*Hubbart*, at p. 1172.) It further stated: "Viewing the legislative record as a whole, we reach a similar conclusion here." (*Ibid.*)

The *Hubbart* court cited the facts that the Legislature disavowed any punitive purpose and declared its intent to establish " 'civil commitment' proceedings in order to provide 'treatment' " for SVP's; the Legislature made clear in Welfare and Institutions Code section 6250 that SVP's are to be viewed "not as criminals, but as sick persons"; and "the SVPA was placed in the Welfare and Institutions Code, surrounded on each side by other schemes concerned with the care and treatment of various mentally ill and disabled groups. [Citation.]" (*Hubbart v. Superior Court, supra,* 19 Cal.4th 1138, 1171.) The Supreme Court has stated the same conclusion, that the SVPA is civil in nature, in numerous other decisions. (*In re Howard N.* (2005) 35 Cal.4th 117, 127 [24 Cal.Rptr.3d 866, 106 P.3d 305] ["[i]n 1995, California enacted a civil commitment scheme . . . entitled the Sexually Violent Predators Act"]; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 252 [127 Cal.Rptr.2d 177, 57 P.3d 654] ["the SVPA is a *civil* commitment scheme"]; *People v. Hurtado, supra,* 28 Cal.4th 1179, 1192 ["the SVPA is a civil proceeding"]; *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 920 [119 Cal.Rptr.2d 1, 44 P.3d 949] [the SVPA "consistently emphasizes the themes common to valid civil commitment statutes"]; see also *People v. Vasquez* (2001) 25 Cal.4th 1225, 1231 [108 Cal.Rptr.2d 610, 25 P.3d 1090] [the SVPA "is protective rather than punitive in its intent"].)

On the other hand, as noted *ante,* the Supreme Court has recognized that "[a]lthough the SVPA is a civil proceeding, its procedures have many of the trappings of a criminal proceeding." (*People v. Hurtado, supra,* 28 Cal.4th 1179, 1192.) Accordingly, courts have on occasion applied criminal law rules, or declined to apply civil law rules, in SVPA cases. In *Hurtado,* the court concluded that federal constitutional error in SVPA cases should be assessed under the standard of prejudice for such error in criminal cases. (*Id.* at p. 1194; see *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In *Bagration v. Superior Court* (2003) 110

Cal.App.4th 1677 [3 Cal.Rptr.3d 292], the court held that civil summary judgment procedures are inconsistent with the requirement of proof beyond a reasonable doubt and the right to a unanimous verdict and therefore should not be applied in SVPA proceedings. (*Id.* at pp. 1688–1689.)

These decisions, however, do not convince us that an SVPA proceeding should be considered a criminal proceeding for purposes of section 1017. The right at stake in considering whether to apply the "criminal proceeding" exception to that statute is the right of a defendant to prepare and present a defense based upon his or her mental condition. Thus, the exception by its terms applies where a psychotherapist is appointed at the request of the defendant's lawyer "to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition." (§ 1017, subd. (a).)

Confidentiality is extended to an expert evaluation in that context because if the defense lawyer decides, based on the evaluation, not to proceed with a plea or defense based on mental condition, the defendant's mental condition is no longer in issue in the proceeding. Conversely, if the defendant proceeds with such a plea or defense, he tenders the issue of his mental condition and waives any claim of confidentiality, including the psychotherapist-patient privilege. (§ 1016; *People v. Combs* (2004) 34 Cal.4th 821, 864 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *People v. Montiel* (1993) 5 Cal.4th 877, 923 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

In an SVPA case, however, there is no such thing as an insanity "plea" or a mental condition "defense." A defendant's mental condition is always in issue in an SVPA proceeding. Mental illness is not a defense; it is the basis on which the offender may be found dangerous to others and hence subject to civil commitment. The only "defense" available to the offender is simply to show that he is no longer dangerous, notwithstanding his previous convictions for qualifying offenses.

Declining to afford confidentiality to a defense expert's evaluation under section 1017 in an SVPA proceeding does not interfere with the ability of the defendant to show he is no longer dangerous. The People already will have obtained evaluations from two experts concluding the defendant meets the SVP criteria. A defense evaluation *concurring* in that conclusion is merely cumulative and can be excluded on that basis. (§ 352.) Therefore, the fact it is not confidential does not prejudice the defendant. Conversely, a defense evaluation reaching a *different* conclusion, as in this case, benefits the offender. Hence, there is no reason for the defense to want to keep that evaluation confidential.

■ For these reasons, we conclude the rule set forth in section 1017, that the psychotherapist-patient privilege applies to a court-appointed expert in a criminal proceeding, should not apply in an SVPA proceeding. Accordingly, the trial court's denial of confidential experts did not violate the psychotherapist-patient privilege.

### 4. *Other privileges**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *Use of Hearsay by People's Expert Witnesses*

In concluding Angulo qualified as an SVP, Dr. Scherrer and Dr. Starr relied in part on facts recited in police reports of Angulo's prior offenses. Angulo contends the use of the police reports for that purpose (1) was not authorized by any statute or case authority, (2) violated the hearsay rule, (3) deprived Angulo of his right of confrontation and his right to due process; and should be process and, (4) violated *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), which was decided after this case was tried.

### 1.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 6. Crawford

■ Angulo suggests admission of the police reports violated *Crawford, supra,* 541 U.S. 36. In *Crawford,* the Supreme Court held that admission of a "testimonial" hearsay statement by a declarant who is not available at trial violates the Sixth Amendment confrontation clause unless the defendant had a prior opportunity to cross-examine the declarant. *Crawford* also held that a statement obtained by a police officer in the course of an interrogation is testimonial. Finally, *Crawford* held the admission of such a statement violates the Sixth Amendment even if the statement would be admissible hearsay under the jurisdiction's rules of evidence and even if it bears indicia of reliability. (*Crawford, supra,* at pp. 52–54, 59, 68.)

*Crawford* does not apply here, for two reasons. First, *Crawford,* a criminal case, was based solely on the Sixth Amendment right of confrontation. The opinion never discussed the due process right of confrontation that is applicable in civil proceedings. At best, *Crawford* leaves open the question

---

*See footnote, *ante*, page 1349.

whether testimonial hearsay statements must be excluded even under the less stringent due process confrontation standard.

While we are not aware of any California authority holding that *Crawford* does not apply to civil commitment proceedings, the Supreme Judicial Court of Massachusetts reached that conclusion in *Commonwealth v. Given* (2004) 441 Mass. 741 [808 N.E.2d 788]. *Given* was a proceeding to commit the defendant as a sexually dangerous person. The defendant objected to the admission of a police report concerning a prior conviction for child molestation.

The report was expressly made admissible by a Massachusetts statute (Mass. Gen. Laws Ann., ch. 123A, § 14(c)), but the question remained whether its admission violated the federal Constitution. The court concluded it did not, because the report was sufficiently reliable to satisfy due process standards, and the Sixth Amendment did not apply: "The *Crawford* case has no direct bearing on this case, because, as we have made clear, the confrontation clause does not apply to civil commitment proceedings. [T]he reasoning of the case rests almost exclusively on the historical background of the confrontation clause and the particular concerns motivating its ratification [citation]." (*Commonwealth v. Given, supra*, 441 Mass. 741, 747, fn. 9.) We agree with the reasoning and conclusion of the court in *Given*.

 The second reason Angulo's *Crawford* claim fails is that *Crawford* is not violated if the defendant had a prior opportunity to cross-examine the declarant. Angulo asserts he was deprived of an opportunity during the SVPA proceeding to cross-examine the victims or the police officers involved in the Arkansas cases, because they were outside California's subpoena power. Angulo overlooks two facts.

First, Angulo had the opportunity to confront the victims and the officers in the Arkansas cases when the matters were being litigated in the *Arkansas* courts, by going to trial on the charges. If he elected not to do so, he necessarily waived his right of confrontation. (*Boykin v. Alabama* (1969) 395 U.S. 238, 243 and fn. 5 [23 L.Ed.2d 274, 89 S.Ct. 1709] [for valid guilty plea, due process requires voluntary and intelligent waiver of confrontation right].)

Second, since the Civil Discovery Act applies to SVPA proceedings, Angulo could have exercised his right of confrontation in the present SVPA proceeding by taking the depositions of the Arkansas victims or police officers and using the depositions at the trial of this case. (Code Civ. Proc., §§ 2025, subd. (u)(3)(A), 2026.) The fact the witnesses could not be summoned to appear at *trial* did not prevent Angulo from confronting and cross-examining them if he so desired.

For these reasons, we conclude the admission of the police reports did not violate *Crawford*.

### C.–F.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## III

## DISPOSITION

The order appealed from is affirmed.

Ward, J., and Gaut, J., concurred.

A petition for a rehearing was denied June 10, 2005, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 17, 2005. Werdegar, J., did not participate therein.

---

*See footnote, *ante*, page 1349.