Filed 3/4/15  P. v. L.F. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059840 |
| v. | (Super.Ct.No. FELSS1205147) |
| L.F., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Victor R. Stull, Judge.  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

In October 2009, defendant and appellant L.F. was sentenced to three years in prison following a conviction for assault with a deadly weapon.  (Pen. Code, § 245, subd

(a)(1).) In December 2010, the Board of Prison Terms (the Board) found that he met the requirements of a mentally disordered offender (MDO) under Penal Code section 2962 and detained him at Atascadero State Hospital for continued involuntary treatment. On October 24, 2012, defendant's MDO commitment was continued, and he was moved to Patton State Hospital (Patton). Defendant filed a petition challenging the Board's determination (Pen. Code, § 2966). On October 1, 2013, a jury affirmed the Board's determination.

Defendant appeals, contending the trial court prejudicially erred in admitting into evidence Patton's Interdisciplinary Notes written by numerous staff members. For the reasons set forth below, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Prior to trial, defendant moved to exclude testimony about the contents of the hospital records, or Interdisciplinary Notes, upon which the prosecution expert witnesses relied. The Interdisciplinary Notes consisted of 13 (out of 545) pages of handwritten notations by staff members at Patton concerning defendant's behaviors, statements, and well-being. Outside the presence of the jury, the attorneys argued about admissibility and whether the jury should be able to consider the Interdisciplinary Notes as evidence. Defense counsel asserted that the prosecution had not laid and would not be able to lay the appropriate foundation to admit the Interdisciplinary Notes, and that the Interdisciplinary Notes alone were unreliable. When asked to identify which specific notes were objectionable, defense counsel maintained that she was "objecting to all of them" because the records were inadmissible hearsay lacking a foundation. In response,

2

the prosecutor argued that her experts could rely upon the Interdisciplinary Notes regardless of whether they were admissible, but agreed that a foundation was necessary for their admission. Nonetheless, she further asserted that the Interdisciplinary Notes were admissible as business records pursuant to Evidence Code section 1561. The trial court agreed that the Interdisciplinary Notes, which are routinely relied upon by professionals in the field, are reliable, and it found them admissible under Evidence Code section 1562.

At the MDO hearing, evidence was introduced through the testimonies of Drs. Robert Suiter, Steven Galarza, and defendant.

## A. Dr. Suiter's Testimony

Dr. Suiter is a psychologist who evaluated defendant on October 2, 2012, to determine whether he suffered from a severe mental disorder, whether he was in remission or could not be kept in remission, and whether the disorder caused him to be a danger to others. The doctor diagnosed defendant with severe schizophrenia, paranoid type. He explained that schizophrenia is an incurable chronic condition, causing delusions which are irrational thoughts (paranoid) or beliefs (grandiose).

Dr. Suiter opined that defendant was not in remission and could not voluntarily be kept in remission, and that defendant presented a substantial danger of harm to others because of his condition. The doctor explained that defendant "hears voices which disrespect him," and suffers from a number of different paranoid delusions. For example, defendant has believed that members of his family attempted to kill him; he was a prisoner of war in a concentration camp; his medication was poisoning his body and his

3

brain; and that the judge in his case, police, and the legal system colluded to hospitalize him so that the hospital would receive funds and other people would be paid for his commitment. During Dr. Suitor's interview with defendant, defendant was medicated but was nevertheless delusional.

In evaluating defendant, Dr. Suiter primarily relied upon Patton's records, including the Interdisciplinary Notes. Within these records, Dr. Suiter found evidence that defendant demonstrated or reported symptoms indicative of his psychotic disorder. Specifically, Dr. Suiter recounted three incidents in August and September 2012. The incidents involved defendant being verbally abusive to hospital staff, entering another patient's room and threatening him, and "mim[ing] with his hand as if he was firing a handgun" at his treating psychiatrist, Dr. Galarza. The incidents were significant because they confirmed that defendant was not in remission and thus posed a danger to others.

## B. Dr. Galarza's Testimony

Dr. Galarza is defendant's psychiatrist at Patton. Defendant has been Dr. Galarza's patient since late 2011. In order to determine what kind of mental disorder defendant suffers, the doctor reviewed his medical history and his legal file, discussed defendant's condition with his mother, and met with defendant personally. Dr. Galarza diagnosed defendant with schizophrenia, paranoid type, and agreed that it is a chronic disease. The doctor testified that defendant suffers from paranoid delusions, such as delusions of conspiracy involving his belief that people want to hurt, attack and kill him. During these periods he would become threatening, requiring emergency doses of medication and multiple staff members to calm him down. In treating defendant,

4

Dr. Galarza explained that the "first thing" is supervision. Defendant attends group sessions where he learns how to regulate his mood, and he is prescribed medications.

Dr. Galarza testified that during the year prior to October 2012, defendant had trouble differentiating between what was reality and what was imagined. He suffered from paranoid delusions, and had a "near zero understanding of his condition." For example, he thought he was in a concentration camp, that members of the staff were Nazis, and that he was being "set up by the government."

Dr. Galarza was shown the Interdisciplinary Notes, and he explained they are Patton's medical records. More particularly, the doctor was questioned as to why defendant was on "30-minute checks" on October 20, 2012. Dr. Galarza explained that during the week ending October 20, defendant was walking around the hospital unit, mumbling to himself, and glaring at other patients and staff. He appeared "very disturbed." Multiple times, he told staff members that he wanted to kill the doctor. Dr. Galarza was warned to stay away from the unit pending further investigation.

In October 2012, defendant was on medication. In fact, a few months earlier, Patton had sought and obtained a court order that allowed staff to "pursue[] an involuntarily medication request" because they feared defendant presented an imminent danger to others. During that same period, if members of the staff were not conducting 30-minute checks on defendant, they were closely supervising him.[1] Because defendant

---

[1] "Close supervision" is often called "one-to-one supervision" and involves a staff member, such as a nurse or psychiatric technician, "follow[ing] a patient around 24/7

*[footnote continued on next page]*

5

felt threatened, he started eating more and doing things to increase his weight because he wanted to "get bigger" in order to protect himself. Other examples of defendant's state of mind include a July 2012 incident in which defendant became agitated because he believed staff members wanted to steal his truck. However, defendant did not own a truck. Also, around the same time, defendant wanted to escape Patton and threatened to hurt the nurses because he thought he was being poisoned.

According to Dr. Galarza, defendant was not in remission; rather, he was "very delusional." The doctor opined that if defendant was left to his own devices, he would stop taking his medications and would present a substantial danger of physical harm to others because of his condition.

## C. Defendant's Testimony

Defendant acknowledged that he suffers from "schizophrenia and bipolar and delusions." He experienced symptoms of schizophrenia and paranoia while serving time in prison for his 2009 conviction. These symptoms necessitated his being kept in the prison's special facility for people with mental health conditions.[2] He was transferred to Atascadero State Hospital, which he believed was a concentration camp, and he saw himself as a prisoner of war. He further believed that the doctors were part of a Nazi

---

*[footnote continued from previous page]*

during the daytime, during the nighttime, just to be able to either redirect him or if [he is] gonna attack someone to attempt to stop it, sound the alarms."

[2] Defendant's conviction resulted from his assault and battery on his roommate, whom defendant believed was the Unabomber.

group because they interrogated him; however, he no longer holds that belief. Defendant maintained that the facility is run like a concentration camp. When asked whether he remembered complaining about the insulin he was being given, he said that it was the medication that was too much and that it was poisoning his body.

Defendant believed that he was transferred to Patton in retaliation for his lawsuit against the manufacturer of a drug "Zyprexa," which he stated caused him to become diabetic.[3] Regarding the incidents that Dr. Suiter referenced, defendant denied threatening other patients at Patton. He claimed they tried to fight with him and he acted in self-defense. He admitted that he had pointed his finger (mimicking a gun) at Dr. Galarza, but he claimed that it was in jest. It was his belief that he was sent to Patton to be protected from drug dealers. He further believed his doctors were giving him drugs to "kill his genes" in order to prevent him from having children. When asked if he really believed that to be true, he replied, "What would be the other alternative [reason for administering the drugs]?"

Regarding his view of members of the legal system, defendant believed that "Judge McComber" and the district attorney "blackmailed" him and "framed him" for seven failures to appear in court. Specifically, he claimed that the "D.A. was deliberately, automatically framing [him] in the courtroom and giving false accusations, saying that [he] was doing something and [he] wasn't . . . ." Defendant opined that the

---

[3] Defendant stated the lawsuit was filed on his behalf by California Department of Corrections and resulted in a settlement.

7

court system was after him and there was a "sting operation" at Patton with the patients acting like detectives who interrogate him.

In defendant's opinion, his medications were not helpful, because they increased his paranoia and caused damaging side effects, including double vision, obesity, high blood pressure, fatigue and chest pains, necessitating a trip to the emergency room. Regarding obesity, defendant admitted that when he first arrived at Patton he weighed 375 pounds; however, now he weighs 295.

## II.  DISCUSSION

In three separate but related arguments, defendant contends:  (1) the trial court erred in admitting the Interdisciplinary Notes because they contained inadmissible hearsay for which there was no exception (hearsay evidence argument); (2) the admission of the Interdisciplinary Notes violated his due process right to a fair trial (due process argument); and (3) absent the admission of the Interdisciplinary Notes, the jury's finding that defendant met the criteria for recommitment as an MDO does not stand (harmless error argument).

## A.  Hearsay Evidence Argument

As a preliminary matter, we note that defendant agreed the experts could rely on the Interdisciplinary Notes for their testimony, even if they were not admitted into evidence.  However, defendant argued at the trial level, and maintains on appeal, that the experts could not testify about the content of the Interdisciplinary Notes because the content was inadmissible hearsay.

The extent to which a document is admissible as a properly authenticated writing made in the regular course of business was discussed in *People v. Nelson* (2012) 209 Cal.App.4th 698, 707-714 (*Nelson*). In that case, this same issue was raised on appeal by another patient at Patton. (*Id.* at p. 707.) "The People sought [and were permitted] to introduce 'Interdisciplinary Notes' made by Patton staff members recording three incidents of Nelson's aggression against other persons during the preceding year." (*Id.* at pp. 703-705.) Nelson challenged the admission of the Interdisciplinary Notes, contending, "because they contain hearsay and multiple hearsay, the trial court erred by allowing the experts to discuss them in detail, providing the jury with them during deliberations, and refusing her request for a limiting instruction." (*Id.* at p. 707.)

Rejecting Nelson's contentions, the appellate court held that hospital records such as the Interdisciplinary Notes fall within the business record exception (*Nelson*, *supra*, 209 Cal.App.4th at p. 710; Evid. Code, § 1271[4]) and "may also qualify as public records under [Evidence Code] section 1280[5] if properly authenticated. [Citation.]" (*Nelson*,

---

[4] "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.)

[5] "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The source of information

*[footnote continued on next page]*

*supra*, at p. 710; see also Evid. Code, § 1280.)  Nonetheless, Nelson argued that Evidence Code sections 1271 and 1280 required the People to call a witness to lay a proper foundation.  (*Nelson*, *supra*, at p. 710.)  The appellate court disagreed, stating: """"Although similar to the business records exception [Evid. Code section 1271], the official records exception differs in one important respect. . . .   [Evidence Code section] 1271 'requires a witness to testify as to the identity of the record and its mode of preparation in every instance.  In contrast, . . . [s]ection 1280 . . . permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation *if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness*.'""  [Citation.]" (*Ibid*., original italics.)  The *Nelson* court further held that the Interdisciplinary Notes "are not testimonial in nature, and thus the due process right of confrontation does not arise.  The notes were recorded by hospital staff members for purposes of discipline and the safety of other patients and staff, and the treatment of Nelson required by her conduct.  The notes do not suggest staff was concerned with possible future litigation." (*Id*. at p. 713.)

We conclude the *Nelson* court's analysis and conclusion are applicable to the case before this court.  Here, the trial court admitted the Interdisciplinary Notes under Evidence Code section 1562.  That section provides:  "If the original records would be

---

*[footnote continued from previous page]*

and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1280.)

admissible in evidence if the custodian or other qualified witness had been present and testified to the matters stated in the affidavit, and if the requirements of [Evidence Code] [s]ection 1271 have been met, the copy of the records is admissible in evidence. The affidavit is admissible as evidence of the matters stated therein pursuant to [Evidence Code] [s]ection 1561 and the matters so stated are presumed true. When more than one person has knowledge of the facts, more than one affidavit may be made. The presumption established by this section is a presumption affecting the burden of producing evidence." (Evid. Code, § 1562.) "Although hospital and medical records are hearsay, they can be admitted under the business records exception to the hearsay rule" when properly authenticated. (*Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 742; Evid. Code. § 1271.) A trial court has wide discretion to determine whether a sufficient foundation was laid to qualify a document as a business record, and we will not reverse the trial court's ruling absent an abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011.) To demonstrate an abuse of discretion, the defendant must show """"no reasonable basis"""" for admitting the evidence. (*People v. Dean* (2009) 174 Cal.App.4th 186, 193 [Fourth Dist., Div. Two].)

The requirements of Evidence Code section 1271 were met. According to Exhibit 1, Stephanie Perez, Director of Health Information Management at Patton, certified that "the accompanying documents are true copies from the **Patton State Hospital** DESIGNATED RECORD SET (DRS), and that I am the duly authorized custodian thereof and have the authority to certify such records, that such records are prepared by the personnel of the hospital in the ordinary course of hospital business at or near the time

11

of the act, condition or event. [¶] Documents containing handwritten entries are prepared by the professional staff signing the entry." (Exh. 1, original boldface.)

Additionally, Dr. Galarza testified that the Interdisciplinary Notes were created as part of the regular course of business at Patton and they reflect defendant's interactions during the course of his treatment. The doctor added that the contents of the Interdisciplinary Notes are governed by medical standards and they are written by "members of the clinical team and people that work on the unit," such as nurses, therapists and the doctor. He verified the contents of the Interdisciplinary Notes by speaking with the people who wrote them and, in the case of defendant's threat against the doctor's life, by personally speaking with defendant. Moreover, Dr. Galarza testified that he personally observed some of the conduct described in the Interdisciplinary Notes and discussed that conduct, and other issues, with defendant. The Interdisciplinary Notes are reliable and fall within the umbrella of the business records exception. (*Fuller v. White* (1948) 33 Cal.2d 236, 242; *Loper v. Morrison* (1944) 23 Cal.2d 600, 608 ["There is no reason to believe that a hospital record is not as truthful as a record kept by a commercial firm. It is a record upon which treatment of the patient is based, and experience has shown it to be reliable and trustworthy."]; *People v. Dean*, *supra*, 174 Cal.App.4th at p. 197, fn. 5.) "Hospital records may also qualify as public records under [Evidence Code] section 1280 if properly authenticated. [Citation.]" (*Nelson*, *supra*, 209 Cal.App.4th at p. 710.)

Nonetheless, defendant argues that the Interdisciplinary Notes are not reliable and, therefore, are inadmissible because they contain a number of levels of hearsay. At the

12

trial level, defendant made no individualized objections to any specific notes, even when the trial court said, "Well, let's take it page by page if we have to. Tell me what's wrong with Page 1, et cetera or what specific pages are you objecting to?" Defendant's only response was, "I'm objecting to all of them unless their expert can lay a foundation, can cite a specific hearsay exception to it." The People argue defendant has forfeited his hearsay objections to the Interdisciplinary Notes by failing to specify his individualized objections. We agree; nonetheless, the People address the merits of the issue and so will we.

We begin by noting that the People did not seek to introduce all 545 pages of Interdisciplinary Notes. Rather, they offered 13 pages, which contain the observations for the following dates in 2012: June 6, 13, 14, 15 and 20; July 11, 13, 23, 24; August 18, 29, 30, and 31; September 5; October 11, 16, 17, 18, 19 and 20; along with one page that appears to be a typed summary of defendant's background. (Exhs. 1A-1M, inclusive.) Although defendant continues to assert his objection to all of the Interdisciplinary Notes, he fails to address each note. Rather, he limits his discussion to a few select entries from Exhibits 1A, 1E,[6] 1F, and 1M. Defendant's criticism of the generic references to "patient" is misplaced when viewed in light of the doctor's testimony. Use of the word "patient" means the patient being treated; the use of the words "peer" or "peers" refers to another patient or patients.

---

[6] Although defendant cites Exhibit 1B, this appears to be a typographical error, because the identical excerpt appears in Exhibit 1E.

13

Defendant's first complaint is that it is unclear whether the author of some Interdisciplinary Notes was present and observed defendant's specific action. For example, a note from October 19 states: ". . . so far today there was only 1 occasion where [defendant] 'went off' post breakfast, argued with the staff started cursing . . . but no physical altercation noted." However, Dr. Galarza testified that it is the duty of Patton staff "to document when they observe something that's clinically relevant . . . and they're trained to document things precisely as much as they can to what they observed or what they discussed with a patient." Thus, the notes reflect the observations of the author.

The same analysis applies to defendant's criticism of an October 17 Interdisciplinary Note (17:00 hours), which states defendant was "talking to things not visible . . ."; an October 17[7] Interdisciplinary Note (no time identified[8]) which states, "Spoke [with] Dr. @ approx. [11:35 hours] re: meds, doseages [*sic*], changes, alternatives, etc. . . . [patient] delusional about 'The Feds-R-doing things 2 not make me make it . . .' Goin' on & on [with] delusions. Redirected but . . . ."; and an October 16 Interdisciplinary Note (07:20 hours), which states: "It was explained to Mr. Freund that we can call the HPO's but . . . ." Regarding the October 16 Interdisciplinary Note (07:20 hours), defendant complains that the use of passive tense makes it impossible to

---

[7] Defendant incorrectly identifies the date as being October 18 and that it is Exhibit 1B; however, the Interdisciplinary Note quoted is from October 17 (no time identified) and is found in Exhibit 1C.

[8] Although there is no indication of the time, the writing suggests that it is a continuation of the note identified at 11:22 hours.

14

determine who did the explaining. However, the note later states that defendant cursed and "kicked at this writer . . . ."

Next, defendant references a note from 07:00 hours on October 17, identified as "(Late entry) for 10-16-12 0720," and states: "Mr. Freund approached nurses station to speak [with] shift lead regarding medication and requested to speak to HPO. Shift lead stated 'we can call HPO but due to court order you will still need to receive injection. Mr. Freund rapidly escalated with anger and kicked at shift lead stating, 'Fuck you' he was yelling and cursing imposing imminent danger. Placed in 5 point restraint [with] 1:1 observation." Defendant complains that this entry fails to meet the foundational requirement because it was not written at or near the time of the event and describes something that happened to a third party, with no indication whether the author actually witnessed it or was told about it. Again, Dr. Galarza's testimony supports a finding that the author, at a minimum, witnessed the incident. In any event, the contents of this note were confirmed by the October 16 (07:20 hours) note written by the direct victim of defendant's kick, contemporaneously with the event, and discloses the same facts.

Finally, defendant labels Exhibit 1M as the "worst offender." This page is a typewritten historical record setting forth defendant's personal history. As the People point out, the certification that accompanies Exhibit 1 explains that typewritten notes are "generated as a result of professional staff requesting that certain information be keyed into the computer to generate date in a specific format, such as . . . demographic information or schedules, and is abstracted from handwritten or typed documents . . ."

15

Thus, the original source of the information in Exhibit 1M was obtained in the "ordinary course of hospital business."

Given the above, we conclude the trial court did not abuse its discretion in finding a sufficient foundation to admit Exhibit 1 as a business record. (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1011; *People v. Dean*, *supra*, 174 Cal.App.4th at p. 193.)

## B. Due Process Argument

Defendant contends the admission of the Interdisciplinary Notes violated his due process right to a fair trial because he was denied his right to confrontation. Not so.

It is important to note we are not presented with evidence admitted in a criminal prosecution, wherein a defendant has a Sixth Amendment right of confrontation. The confrontation clause of the Sixth Amendment prevails over a state's rules of evidence insofar as testimonial hearsay is concerned. (*Crawford v. Washington* (2004) 541 U.S. 36, 51.) In a noncriminal matter, any right of confrontation is brought to bear not by the Sixth Amendment, but by the due process clause of the Fourteenth Amendment. (*People v. Otto* (2001) 26 Cal.4th 200, 214.) A key difference between testimonial hearsay considered under the Sixth Amendment and the same evidence considered under a due process analysis is that while such evidence is inadmissible under the Sixth Amendment in a criminal prosecution regardless of the reliability of the evidence (*Crawford v. Washington*, *supra*, at pp. 61-64), reliable testimonial hearsay admitted pursuant to the Evidence Code is not categorically inadmissible under due process. (*People v. Angulo* (2005) 129 Cal.App.4th 1349, 1367-1368 [Fourth Dist. Div. Two].)

16

Needless to say, an individual facing an involuntary civil commitment is entitled to due process. (*People v. Otto*, *supra*, 26 Cal.4th at p. 209.) However, the risk of an erroneous deprivation of an alleged MDO's compelling interest in remaining free from an involuntary civil commitment posed by admission of evidence pursuant to Evidence Code section 1271 is not substantial. (See *People v. Castillo* (2010) 49 Cal.4th 145, 165-166.) Here, the hearing provided defendant was fundamentally fair, the touchstone of due process. (Cf. *People v. Superior Court (Howard)* (1999) 70 Cal.App.4th 136, 154-155.) In addition to meeting the Evidence Code section 1271's requirements for admission as business records, the court found the documents reliable. Defendant was able to cross-examine the experts who relied on the records in forming their opinions, had access to discovery procedures—civil and criminal (Pen. Code, § 2972, subd. (a))[9]—and was free to subpoena as witnesses and examine those individuals who prepared the records.[10] Nothing prevented defendant from presenting his "'side of the story before a responsible government official.'" (*In re Parker* (1998) 60 Cal.App.4th 1453, 1462-1463.)

---

[9] As the civil discovery act applies to MDO proceedings (Pen. Code, § 2972, subd. (a)), defendant could have taken the depositions of the individuals who made the entries into his medical chart. (*People v. Angulo*, *supra*, 129 Cal.App.4th at p. 1368.) When defense counsel was asked whether there were "any outstanding discovery issues," she replied, "No."

[10] The fact that entries in defendant's medical chart are written in the third person does not mean the facts set forth therein were not observed by the staff members who made the entries.

17

For the above reasons, we conclude the admission of the Interdisciplinary Notes did not violate defendant's due process rights.

## C. Harmless Error Argument

Having concluded that defendant's due process rights were not violated, his prejudicial error contention is moot.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST

J.

We concur:


RAMIREZ

P.J.

MCKINSTER

J.