Filed 12/19/14  P. v. Hubbs CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NORMAN JAMES HUBBS,<br><br>    Defendant and Appellant. | D063955<br><br><br>(Super. Ct. No. FBABS700108, FBABS05997) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Steve C. Malone, Judge.  Reversed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

Norman James Hubbs appeals a judgment committing him to the Department of State Hospitals at Coalinga for an indeterminate term for treatment and confinement as a sexually violent predator (SVP) under the provisions of the Sexually Violent Predators Act (Welf. & Inst. Code,[1] § 6600 et seq.) (SVPA) following a court finding that he is an SVP.

Hubbs contends (1) his trial counsel was ineffective; (2) the trial court erroneously denied his motion under *People v. Mardsen* (1970) 2 Cal.3d 118 (*Marsden*); (3) the trial court erred in granting the prosecution's motion to consolidate the two SVP petitions; (4) the trial court abused its discretion by denying Hubbs the right to represent himself; (5) the trial court erred when it allowed Hubbs's trial counsel to waive his right to a jury trial over Hubbs's objection; (6) he had a constitutional right to a jury trial; (7) cumulative errors require reversal; and (8) the recent amendments to the SVPA are unconstitutional.

We agree with Hubbs there were numerous errors leading up to his trial and these cumulative errors rendered his trial fundamentally unfair. We therefore reverse the judgment and remand this matter for a new trial. In reaching this conclusion, we do not address any of the constitutional issues Hubbs raises.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

FACTUAL AND PROCEDURAL BACKGROUND

A. Hubbs's Underlying Convictions of Sex Offenses[2]

In the underlying criminal prosecution (*People v. Hubbs* (Super. Ct. San Bernardino County, 1991, No. BCR-2641), a jury convicted Hubbs of a total of 11 counts of committing lewd and lascivious acts upon, and three counts of engaging in oral copulation with five boys under the age of 14 years in violation of Penal Code sections 288, subdivision (a), and 288a, subdivision (c), respectively.

B. Hubbs's Previous Commitment

On April 13, 2006, a jury found Hubbs was an SVP and the court recommitted Hubbs to Atascadero State Hospital for a two-year period for treatment and confinement. Hubbs appealed the related judgment, and we reversed the judgment on the grounds that Hubbs's trial counsel was prejudicially ineffective. In making this determination, we noted that Hubbs's trial counsel did not obtain funding to retain an expert on Hubbs's behalf. In addition, we observed that Hubbs's trial counsel did not subpoena any expert witnesses to appear at trial. Because the statutory framework shows that SVP commitment petitions are generally decided on the basis of expert testimony (see *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1358), we concluded Hubbs's utter failure to secure any expert to testify at trial was prejudicially ineffective assistance of counsel.

---

[2] The following brief history of Hubbs's prior sexual offense convictions is taken from this court's unpublished opinion in his prior appeal (*People v. Hubbs* (Oct. 11, 2005, D043625), hereafter referred to as *Hubbs I*).

3

(See *People v. Hubbs* (Feb. 20, 2008, D048607) [nonpub. opn.] (*Hubbs II*).) We issued a remittitur on April 21, 2008.

C. Hubbs's Most Recent Recommitment Hearing

On March 27, 2007, the district attorney filed a petition seeking to commit Hubbs as an SVP for a period of two years. In a series of continuances, many revolving around Hubbs's apparent problems with appointed counsel, the probable cause hearing was delayed until December 3, 2007 when it was waived by Hubbs's counsel.

On May 7, 2008, the district attorney amended the March 27 petition seeking to commit Hubbs as an SVP for an indefinite period of time. The prosecution also moved to consolidate the instant petition with the previous petition that resulted in a judgment, which was reversed in *Hubbs II*. The court granted the motion. The matter eventually proceeded to trial on March 14, 2013.

1. Prosecution

The prosecution presented the testimony of two experts, Drs. Robert Owen and Carolyn Murphy. Owen, a licensed clinical psychologist, testified he first met Hubbs in August 2001. He had conducted seven evaluations of Hubbs from August 2001 through 2012. He interviewed Hubbs in 2005. Owen also reviewed police reports, probation reports, and medical records regarding Hubbs.

Owen diagnosed Hubbs with pedophilia with a sexual attraction to males and personality disorder with antisocial features. He defined pedophilia as "a condition involving at least six months of deviant fantasies, urges or behaviors directed towards children who are preadolescent, generally 13 years and younger." Owen highlighted

4

several factors that supported his diagnosis. He noted that Hubbs went to great lengths to molest his victims by creating a "boy[-]friendly environment." Hubbs had a boy living in his home who brought other boys to the home. Owen opined that Hubbs then exploited the boys that were particularly vulnerable and molested them. Owen also noted that while Hubbs was in the state hospital in 2008, he drew a collage that included a nude child.

Murphy, a clinical psychologist, first met and evaluated Hubbs in 2007. She updated her report in November 2009 and September 2010. She reevaluated Hubbs in October 2012. Murphy diagnosed Hubbs with pedophilia, depressive disorder, and personality disorder not otherwise specified with narcissistic traits. She noted that Hubbs's sheer number of offenses and pattern of conduct evidenced his pedophilia and demonstrated that the disorder affected his volitional control. She also observed that Hubbs had not attempted to modify his behavior or seek treatment, and that he continued to offend despite consequences and sanctions.

Both Owen and Murphy evaluated Hubbs using the Static 99-R, an actuarial tool that measures the risk of sexual reoffense. Owen scored Hubbs at a 3, but stated that his score could also be a 4 depending on whether he actually had a significant live-in relationship with a partner. The score placed Hubbs in the low to moderate risk of reoffending, indicating a 15 percent risk of reoffending within five years and 24 percent within 10 years. Murphy scored Hubbs with a 4, which placed him in a moderate to high category and indicated that his risk of recidivism was higher than 63 to 77 percent of offenders.

Based on their interviews, evaluations, and assessment of Hubbs's criminal background and risk scores, Owen and Murphy opined that Hubbs's pedophilia affected his volitional control, predisposed him to committing sexual offenses, and that he was likely to reoffend in a sexually violent predatory manner in the future if released. They ultimately opined that Hubbs met the criteria for commitment as an SVP.

### 2. Defense

Hubbs testified in his defense at trial. He stated that he had never been attracted to children, had never engaged in any sexual act with a child, and was wrongfully accused and convicted in all 12 instances. He said the children in Indiana made up the allegations possibly to "get even for something." He filed a lawsuit against the San Bernardino County Sheriff's Department prior to being arrested and accused of child molestation.

Hubbs testified that the reason he has not expressed remorse for the events that led to his convictions is because they are false allegations. He was wrongfully convicted and he has not done the things for which he has been convicted.

### DISCUSSION

### I

### *INEFFECTIVE ASSISTANCE OF COUNSEL*

Hubbs contends that his trial counsel was ineffective, and thus, violated his Sixth Amendment due process rights. Specifically, Hubbs asserts his trial counsel was

6

ineffective for: (1) failing to offer an expert witness in defense of Hubbs at trial and (2) waiving Hubbs's right to a jury trial.[3]

## A. Background

On December 3, 2007, James Gass was appointed as Hubbs's defense counsel. On November 3, 2009, at a status conference hearing, Gass stated that he had a list of doctors to contact as potential defense experts, but would need to request additional funds from the county administration.

At a status hearing held on January 12, 2010, Gass stated that he had not yet retained an expert because he had just received the prosecutor's latest evaluation and would need to send it out to a potential expert to review. Counsel submitted to the court an application to appoint Dr. Jay Adams as a defense expert. The trial court granted the order, which included funds for the expert to conduct an initial evaluation.

On March 12, 2010, at another status conference, Gass stated that he had a male expert lined up who had looked at the evaluations and was willing to help. He stated he would be submitting a new request for funding. Following several continuances, at a status hearing on December 16, 2010, Gass told the court that his request for funds had been denied. Following the probable cause hearing on January 18, 2011, Gass again explained that his request for more expert funds had been denied, but that he planned to have a hearing before the judge who denied the funds.

---

[3]     We discuss the waiver of jury trial and its impact on Hubbs's trial later in this opinion.

7

At a status hearing on September 7, 2012, Gass informed the court that he had spoken with a female expert who reviewed some of Hubbs's records. She told him she could not help.

On the day of trial, in a *Marsden* hearing, Gass explained his efforts in attempting to secure a defense expert. He stated that though he had contacted Adams, she ultimately indicated that there was not much she could say that would help Hubbs's case.

### B. Law and Analysis

To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

Here, Hubbs's trial counsel did not retain or present an expert witness on behalf of Hubbs at trial. As Hubbs points out, the failure of his previous trial counsel to obtain funding to retain an expert on Hubbs's behalf was the primary reason we reversed his previous judgment on the grounds that his trial counsel was prejudicially ineffective. However, there exist differences between the instant matter and *Hubbs II*.

In *Hubbs II*, it was clear that Hubbs's counsel did very little to retain an expert. He did not attempt to obtain funding to retain an expert. He did not subpoena an expert although he was aware of two who would possibly testify favorably on behalf of Hubbs. In contrast, here, Gass at least made some effort to retain an expert. He obtained funding

8

for Adams, but Adams apparently could not help Hubbs's case. There is some indication in the record that Gass contacted at least one other potential expert and there is a reference to failed attempts to obtain additional funding. However, the record does not shed much light on these additional efforts as it does not contain Gass's additional requests for funding or the court's denial of same.

There simply is not enough in the record on which we can evaluate Hubbs's claim of ineffective assistance of counsel. Gass's efforts to retain an expert surpass what we concluded was prejudicially ineffective in *Hubbs II*, but here we are left to guess as to the extent of Gass's efforts. Without more in the record, we cannot adequately address this issue.[4] An appellate court generally cannot fairly evaluate counsel's performance at trial based on a silent record. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) In many instances, like here, evaluation of a claim of ineffective assistance of counsel will have to await a petition for writ of habeas corpus, should the defendant believe there is a viable claim that can be pursued. (*Ibid.*) Accordingly, we conclude that Hubbs's claim of ineffective counsel is without merit.

---

[4]     Hubbs also claims his counsel was ineffective because he waived jury trial over Hubbs's objection. We address counsel's waiver of jury trial below, but for purposes of our analysis of the ineffective of assistance claim, this waiver does not help Hubbs's assertion on the record before us. As we explain in more detail in a later section of this opinion, there is little in the record to explain Gass's decision to waive jury trial. As such, we cannot sufficiently examine Hubbs's claim on the record before us.

II

MARSDEN *HEARING*

Hubbs contends the trial court erroneously denied his *Marsden* motion.  We agree.

The trial court did not adequately probe Hubbs's alleged problems with Gass's

representation of him and the record strongly implies that the trial court had decided it

was going to deny the motion prior to even hearing it.  On this record, it appears the court

did not exercise its discretion by failing to hold an adequate *Marsden* hearing.

A.  Background

On the morning of his trial, Hubbs reminded the court that he had a *Marsden*

motion pending.  The trial court acknowledged that Hubbs had filed the motion.  The

prosecutor objected to the timeliness of the motion, but the trial court interrupted her,

reassuring her:  "If you give me five minutes, I could get this done in less time than you

would by making a record."

The court then held a hearing on Hubbs's *Marsden* motion.  The court permitted

Hubbs to state some of his complaints:

> "Mr. Gass has not contacted me in two years.  As a matter of fact,
> over two years ago he moved his office and never even bothered to
> tell me.  He gave me no notice that I'd even had a probable cause
> hearing.  He waived my rights to be present at that hearing and
> presenting evidence.  He has presented me with no defense
> evaluations which under the statute I have a statutory right to have
> those.  Mr. Gass has just had a complete breakdown in
> communication, plus the fact that now he has waived my rights to
> have evaluators here at this trial for the defense.  I have no experts at
> all because he has not made any arrangements for any.

"Mr. Gass has waived my rights to the jury trial, which I have copies of the letters that I have sent him over the years and he should be very well aware of I had witnesses to be called. I wanted to be present at the probable cause hearing. I wanted to be present telephonically at all of the other hearings and I have a court order from a previous judge in this case that granted me that right. And yet Mr. Gass hasn't contacted me at all. He had all of these hearings without me even knowing about them. I mean, Mr. Gass has waived all of my rights without even contacting me, and I feel that this is a complete denial of due process."

The court offered Gass an opportunity to respond:

"I got a letter from Mr. Hubbs, I believe in 2010 he told me that his second knee replacement failed and he was going to be in the medical ward for an extended period of time pretty much unable to move around and do much. I did speak with an expert recommended or requested by Mr. Hubbs. Her name is Jay Adams. She indicated that there wasn't really much she could say that would help in this particular case. I told Mr. Hubbs that. I spoke to him on the phone probably close to two dozen times in the last four years, let him know what was happening when it was happening.

"We had a probable cause hearing. I tried to make telephone contact with him and were [sic] unable to. I sent him a copy of the transcript, which he has. He says there are witnesses he called. I'm not aware of any witnesses. Mr. Hubbs wants to attack the underlying conviction and we're not able to attack the underlying conviction. They are findings by two juries that he has qualifying convictions, so that's the situation."

After listening to Gass's response, the trial court denied the *Marsden* motion.

Hubbs tried to object, claiming a right to call a witness. The court attempted to silence Hubbs, leading to the following exchange:

"THE COURT: Mr. Hubbs, we have a court reporter that's here. You've stated what your complaints are. They are part of the record.

"[Hubbs]: No sir. No, sir, I haven't stated all of them.

11

"THE COURT:  That's all the time you have for this at this point.  It's part of the record.  When we get done with this, if you are—if it does not go in your favor I'll advise you of your appellate rights.  I'm not going to allow—

"[Hubbs]:  I have orders filed before the Court.

"[THE COURT]:  There are.

"[Hubbs]:  I have other motions involved before the Court.

"[THE COURT]:  I'm going to say this one time.  If you keep shouting over me, I'm going to mute you because I'm not—we can't hold the proceedings if you keep yelling into the microphone.

"[Hubbs]:  Are you going to hold a trial without me?

"THE COURT:  You can hear it.  We won't hear you until it's time for you to speak.

"[Hubbs]:  Your Honor, this is not right.  This is unfair entirely.  Mr. Gass is not even qualified.  He's never done a hearing.

"THE COURT:  I'm going to turn the volume down on our end and we'll get back to you.

"[Hubbs]:  I have a motion filed against [the prosecutor] that's in the court.

"[Hubbs]:  Thank you, Mr. Gass.  You are a son of a bitch.

"THE COURT:  We'll seal the record of the *Marsden* hearing.  The *Marsden* hearing [sic] was denied."

### B.  Law and Analysis

A trial court has broad discretion to grant or deny a motion.  When the court denies a *Marsden* motion, we review the denial under an abuse of discretion standard.  A denial is not an abuse of discretion unless the defendant shows the failure to replace the appointed attorney would " ' "substantially impair" ' " the defendant's right to competent

12

counsel.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)  A trial court's discretionary decision will not be disturbed on appeal if there exists a reasonable or even fairly debatable justification under the law for the action taken.  (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507.)  Consequently, we will interfere with the trial court's exercise of discretion only when we conclude that under all the circumstances, viewed most favorably in support of the trial court's action, no judge could have reasonably reached the challenged result.  (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

Under the *Marsden* standard, a defendant must show that appointed counsel is not providing competent representation or that there is an irreconcilable conflict such that ineffective representation is likely to result.  (*People v. Dickey* (2005) 35 Cal.4th 884, 917.)  However, "a defendant does not have the right to the appointment of new counsel absent a clear showing of inadequate representation."  (*People v. Silva* (1988) 45 Cal.3d 604, 622.)  The trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.  (*Marsden*, *supra*, 2 Cal.3d at p. 124.)  A trial court may not deny a request for substitution of attorneys without giving the defendant the opportunity to explain his reasons through presentation of argument and evidence.  (*Ibid.*)  "*Marsden* explains that 'the trial court . . . cannot thoughtfully exercise its discretion in this matter without listening to [defendant's] reasons for requesting a change of attorneys.  A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he [or she] is cognizant of the grounds which prompted the request. . . .  Thus, a judge who denies a motion for substitution of attorneys solely on the basis of his [or her] courtroom observations,

13

despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his [or her] discretion to determine the competency of the attorney. . . .' [Citation.]" (*People v. Leonard* (2000) 78 Cal.App.4th 776, 787.) "Failure to inquire adequately into a defendant's complaints results 'in a silent record making intelligent appellate review of defendant's charges impossible.' " (*People v. Hill* (1983) 148 Cal.App.3d 744, 755, citing *People v. Cruz* (1978) 83 Cal.App.3d 308, 318.)

Here, we are troubled by the trial court's comments preceding the *Marsden* hearing. When the prosecutor started to object to the motion, the trial court told her that it would only take "five minutes" to "get this done." The fact that the court stopped the prosecutor from making a record of her objections to the *Marsden* motion as well as the court's comments that the hearing itself would not take much time raises the inference that the trial court was planning, at best, to hold a perfunctory hearing and had already decided the issue against Hubbs.

The transcript of the *Marsden* hearing does not alleviate our concerns, but instead underscores the superficial nature of the hearing. The trial court allowed Hubbs to state some of his complaints about Gass: (1) Gass had not contacted Hubbs in two years; (2) Gass did not provide Hubbs with defense evaluations; (3) Gass had not retained an expert on behalf of Hubbs; (4) Gass did not inform Hubbs of hearings or let him participate in them; (5) Gass was not intending to present any witnesses on behalf of Hubbs at trial; and (6) Gass waived all of Hubbs's rights for the trial. The court then asked Gass to respond to the complaints, but Gass did not directly respond to them. For example, Gass stated that he has talked to Hubbs 14 times in the past four years, but said

14

nothing about his communications with Hubbs in the past two years. Gass failed to adequately explain why he had not retained an expert. He only stated that he talked to one expert who could not help. In addition, Gass did not explain why he waived many of Hubbs's rights for trial, including his right to jury trial.

Despite Gass's cursory response, the trial court did not further inquire into Hubbs's complaints and quickly denied the *Marsden* motion "[b]ased on the record." The court did so despite Hubbs's claim to have not stated all of his complaints. The court informed Hubbs: "That's all the time you have for this at this point."

The People argue that there is no time requirement for a *Marsden* hearing. We agree, but logically a court must devote sufficient time to understand a defendant's complaints against his attorney and reasonably inquire about them. (See *People v. Leonard*, *supra*, 78 Cal.App.4th at p. 787.) On the record before us, we cannot conclude that the court did so.

The People also argue Hubbs's written *Marsden* motion lessened the need for the court to hold a more complete hearing. (See *People v. Horton* (1995) 11 Cal.4th 1068, 1103 ["[U]nder circumstances in which a defendant has set forth in a 'self-contained document' in sufficient detail the basis for his dissatisfaction with appointed counsel, . . . a 'full-blown hearing' on the alleged inadequate representation is not required."].) We agree with this general proposition of law, but observe there is no indication in the record that the trial court actually considered Hubbs's written *Marsden* motion. That motion contained 17 examples of Gass's alleged representation shortcomings. The court did not ask Hubbs about these assertions or request that Gass respond to any of them. The court

15

did not read any of the motion's claims into the record. Instead, the court merely acknowledged that Hubbs had filed a *Marsden* motion. The trial court's failure to adequately inquire into Hubbs's complaints results in a "silent record" undercutting our ability to review Hubbs's charges. (See *People v. Hill*, *supra*, 148 Cal.App.3d at p. 755; *People v. Cruz*, *supra*, 83 Cal.App.3d at p. 318.)

The People do not address the impact of the trial court's error in failing to hold an adequate hearing on Hubbs's *Marsden* motion. Although *Marsden* error is subject to a harmless error review (see *Marsden*, *supra*, 2 Cal.3d at p. 126), typically such error may be treated as prejudicial per se, since the very nature of the error precludes meaningful appellate review of its prejudicial impact. (*People v. Hill*, *supra*, 148 Cal.App.3d at p. 755; see *Marsden*, *supra*, at p. 126.) This case is no exception to this general rule. In addition, the effect of this error will be considered in connection with the claim of cumulative error.

## III

## *CONSOLIDATION OF SVP PETITIONS*

### A. Background of SVPA

The SVPA, as originally enacted effective January 1, 1996 (Stats. 1995, ch. 763, § 3, p. 5922), provided for the involuntary civil commitment for a two-year term of confinement and treatment of a person who was found beyond a reasonable doubt to be

an SVP.  (See former § 6604;[5] *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1147 (*Hubbart*).)  A person's commitment could not be extended beyond that two-year term unless a new petition was filed seeking a successive two-year commitment. (Former § 6604; *People v. Shields* (2007) 155 Cal.App.4th 559, 562 (*Shields*).)  The SVP extension hearing was a "new and independent proceeding at which the [People] must prove the person [committed] meets the [SVP] criteria," including that he or she has a currently diagnosed mental disorder that renders the person dangerous.  (*Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1289 (*Bourquez*); see § 6605, subds. (d), (e); *People v. Munoz* (2005) 129 Cal.App.4th 421, 429.)

On September 20, 2006, the Legislature enacted urgency legislation amending the SVPA, and on November 7, 2006, California voters approved Proposition 83 (also known as "Jessica's Law") effective November 8, 2006.  (*Shields*, *supra*, 155 Cal.App.4th at pp. 562-563.)  Among other changes, "former section 6604 was amended to eliminate the two-year [commitment] term provision and to provide for an indeterminate term of confinement. . . ."  (*Id.* at p. 562.)  Amended section 6604 provides in part:  "If the court or jury determines that the person is [an SVP], the person shall be committed for an indeterminate term to the custody of the [DMH] for appropriate treatment and confinement. . . ."

---

5    Former section 6604 provided in part:  "[T]he person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a [new] petition for extended commitment under this article or unless the term of commitment changes pursuant to subdivision (c) of Section 6605."

17

B.  The Consolidation of Hubbs's Petitions

In 2006, Hubbs was recommitted to a two-year term in the state hospital, in case number FBABS5997 (prior petition).  In *Hubbs II*, on February 20, 2008, we reversed the judgment and remanded the matter for a new trial.  We issued the remittitur on April 21, 2008.  However, more than a year prior to the issuance of the remittitur, the district attorney filed the current petition.  It was amended over a year later on May 7, 2008 to account for the change in the SVPA.  The prosecution then moved to consolidate the prior and current petitions.  At that time, neither the prior petition nor the current petition had been set for trial.

On May 9, 2008, the trial court held a hearing on the motion to consolidate.  The prosecution argued that the trial court had authority under Code of Civil Procedure section 187 to consolidate the petitions and that consolidation would not cause prejudice or delay since neither case had a trial date set.  Defense counsel opposed consolidation and stated that Hubbs had a right to have a trial on the prior petition.  The prosecution explained the petitions encompassed the same prior convictions, and the same requirement of finding a current mental disorder and likelihood of predatory reoffense, and that a trial under the prior petition alone would result in an indeterminate term, and not a two-year term, because of the recent changes to the SVPA.

When the trial court asked defense counsel what the point was then in objecting to the consolidation, Hubbs asked to be heard and stated that because the case was reversed it "reverts it right back to as if it never happened."  He further stated that he was entitled to a trial on the prior petition under the law that was in effect at the time of the prior trial.

18

He argued that consolidating the cases would prejudice him because he would be subject to an indeterminate term and not the two-year term he claimed was applicable under the prior petition. The court explained to Hubbs that even if he was tried on the prior petition that originally indicated a two-year term, if found to be an SVP, he would be committed to an indeterminate term, but Hubbs maintained that a new trial should be "under the same circumstances, same law as the original" trial. The trial court subsequently granted the prosecution's motion and ordered the petitions consolidated.

## C. Law and Analysis

Hubbs contends the trial court erred when it consolidated the prior and current petitions because he was entitled to a retrial under the law as it existed at the time the prior petition was first tried. We disagree.

In *Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, 1174 (*Litmon*), the court concluded that "the trial court has the inherent power to consolidate" trials held pursuant to the SVPA. There are limits, however, to that power. "[U]nless an SVP consents to it, resort to consolidation should rarely be necessary. If a recommitment petition is tried at or near the commencement of the commitment period to which it relates, there will be no overlapping petition and thus no need for consolidation. If, for some compelling reason, the first recommitment petition cannot be tried before a second recommitment petition is also ready to be tried by both sides, it may well be that consolidation does not violate this legislative intent. However, when the trial on the earlier petition can be held within the two-year commitment period to which it relates, and the SVP has announced ready for trial and has objected to consolidation or a

19

continuance, consolidation appears to be at odds with the legislative intent codified in the SVPA. The SVPA is designed to ensure that the continued confinement of an SVP is justified, if at all, at least every two years. The legislative scheme's emphasis on frequent justification for the confinement of each SVP demands that an SVP not be confined without an adjudication of the justification for that confinement, solely because judicial resources will thereby be conserved." (*Litmon*, *supra*, at pp. 1175-1176.) "[B]ecause the SVPA evidences a legislative intent to provide a trial on every filed recommitment petition as close in time to the expiration of the prior commitment as practicable, it is error to order consolidation over objection when a consolidated trial can occur *only* if the earlier petition is further delayed." (*Id.* at p. 1176.)

Hubbs asserts his petitions could not be consolidated under *Litmon*, *supra*, 123 Cal.App.4th 1156. He argues that *Litmon* stands for the proposition that it is inappropriate to deprive a defendant of his opportunity for an additional trial when the delays that led to the consolidation were over his objection and imposed by the prosecution. Hubbs notes that here trial on the prior petition occurred during the two-year commitment period, but the judgment was reversed because he was appointed an ineffective counsel. He insists the delay that led to the decision to consolidate the two petitions occurred because the government failed to provide him with a competent attorney. We are not persuaded.

In the instant matter, there were no delays caused by the consolidation of the previous and current petitions. The current petition had not been set for trial. Since the remittitur, the previous petition had not been set for trial. Accordingly, the consolidation

20

of the two petitions did not run afoul of the holding of *Litmon*, *supra*, 123 Cal.App.4th 1156. The "delay" Hubbs complains of occurred because we reversed the judgment recommitting him as an SVP in *Hubbs II*. The reversal is not a delay of the type that the court warns trial courts to be careful of in *Litmon*, *supra*, 123 Cal.App.4th 1156. Indeed, instead of a delay, the reversal in *Hubbs II* is simply Hubbs's prior petition running its course. After remittitur, a new trial would have to be set in any event. As a trial had not been set, it was not delayed by the consolidation with the current petition.

In addition, we agree with the trial court that judicial economy is well served by the consolidation of the two petitions. They concern the same prior convictions, the same requirement of finding a current mental disorder and likelihood of predatory reoffense, and the same witnesses and evidence in general. It makes little sense to make the prosecution try two separate cases.

Nevertheless, Hubbs contends two separate trials are required because, based on the reversal in *Hubbs II*, he is entitled to a trial on a petition that only seeks a two-year commitment. Hubbs, however, offers no compelling authority to support his position.

In *People v. Carroll* (2007) 158 Cal.App.4th 503 (*Carroll*), the Court of Appeal evaluated how and when the SVPA amendment imposing an indeterminate term of confinement applied to SVPs. In *Carroll*, at the time the recommitment petition was filed against the defendant, the SVPA mandated a two-year commitment for SVPs. However, at the time of trial, the People asked to amend the petition to seek an indeterminate term, to reflect the amendments to the SVPA. The trial court granted the request and ruled that if the petition were found true, the commitment would be for an indeterminate term. The

21

defendant was found to be an SVP.  On review, the court recognized that "[b]y changing SVP terms from two years to an indeterminate period of time, the Legislature unequivocally conveyed an intent to continue the confinement of persons adjudicated to be SVPs."  (*Id*. at p. 510.)  The court observed that "because 'the trial on any petition for commitment or *recommitment* must focus on the person's *current* mental condition,' " "the significant point with respect to retroactivity is not the filing of the petition, but trial and adjudication under the SVPA."  (*Carroll*, *supra*, at pp. 513-514; accord, *Bourquez*, *supra,* 156 Cal.App.4th 1275, 1288.)

We see no difference between the defendant in *Carroll* and Hubbs here.  As *Carroll* made clear, the dispositive factor in determining when an SVP is subject to the amended SVPA is the time when the person's current mental condition establishes he is an SVP.  (*Carroll*, *supra*, 158 Cal.App.4th at pp. 513-514.)  Our reversal in *Hubbs II* entitled Hubbs to a new trial on the determination of whether he is currently an SVP.  Hubbs received that.  In his new trial, the court determined that Hubbs presently suffers from a qualifying mental disorder that makes him an SVP.  Hubbs thus was subject to recommitment for an indeterminate term because at the time he was determined to be an SVP, the amendments had become effective.  (*People v. Taylor* (2009) 174 Cal.App.4th 920, 933; *Carroll*, *supra*, at pp. 513-514; *Bourquez*, *supra*, 156 Cal.App.4th at p. 1288.) There was no error.

## IV

### *RIGHT TO SELF-REPRESENTATION*

Hubbs contends that the trial court erroneously denied his request to represent himself and failed to exercise its discretion in denying his request because the court did not "follow[] any appropriate procedure."

### A. Background

On April 20, 2007, the trial court had a hearing on the current petition. At the hearing, the Public Defender's Office declared a conflict. When the trial court indicated that Lorene Mies would be appointed as Hubbs's defense counsel, the following exchange occurred:

> "[Hubbs]: I do not want that, your Honor.
>
> "THE COURT: You no longer have a right to represent yourself in a sexually violent predator proceeding. There is a new case on the subject, and you may not represent yourself at this time.
>
> "[Hubbs]: Well, I refuse this attorney.
>
> "THE COURT: Feel free.
>
> "[Hubbs]: It says you cannot force me to take an attorney.
>
> "THE COURT: Yes, the law does say I can. So with that, we need to set different dates.

Hubbs again objected and the court stated that his objection was noted for the record. Later during the proceedings, Hubbs asked to speak with his attorney, and when the trial court told him, "be quiet," Hubbs stated that he wished to enter a peremptory challenge against the trial judge. The court replied, "[t]hat's up to your attorney, not up to

23

you. You're not representing yourself." Hubbs stated that he had been representing himself and added that he objected to the whole proceeding.

On September 17, 2007, Mies was relieved as Hubbs's counsel and the court appointed the conflict panel to represent Hubbs. On December 3, 2007, Gass was appointed as Hubbs's attorney. Gass appeared on behalf of Hubbs and waived both Hubbs's presence and the probable cause hearing.[6]

### B. Analysis

Section 6603, subdivision (a) states that a person subject to SVP proceedings is "entitled . . . to the assistance of counsel." Implied in that statutory right to assistance of counsel is the right to refuse counsel and proceed pro per.

In *People v. Williams* (2003) 110 Cal.App.4th 1577 (*Williams*), we determined that the language of the mentally disordered offender (MDO) commitment statutes implicitly provided a statutory right to self-representation. We noted that Penal Code section 2972 states that in a hearing for continued involuntary commitment as an MDO the, " 'court shall advise the person of his or her right to be represented by an attorney.' " (*Williams*, *supra*, at p. 1588, italics omitted.) We reasoned that "[section 2972] expressly gives the right to counsel to defendants in MDO proceedings and surely they have by implication the right to refuse appointed counsel and represent themselves." (*Williams*, *supra*, at p. 1591.)

---

6    Although not explained why in the record, a probable cause hearing was held over three years later.

24

Here, the trial court twice told Hubbs that he "no longer ha[d] a right to represent [himself]" because there was a new case on the subject and that he could force Hubbs to proceed with an attorney. Although the trial court did not cite to a specific case, the parties agree that it appears the trial court was relying on the holding of *People v. Fraser* (2006) 138 Cal.App.4th 1430. In that case, the Court of Appeal determined that a defendant in an SVPA proceeding did not have a Sixth Amendment right to self-representation. (*Fraser*, *supra*, at p. 1446.) However, the court acknowledged *Williams*, *supra*, 110 Cal.App.4th 1577, and never reached the issue of whether the defendant had a statutory right to self-representation. (*Fraser*, *supra*, at p. 1450.) As such, *Fraser* does not stand for the proposition that Hubbs could not represent himself in the SVP proceeding. Thus, the trial court erred when it told Hubbs twice that he was legally prohibited from representing himself.

The People argue that we review the trial court's denial of Hubbs's request for an abuse of discretion and should " 'reverse only if it is more probable than not that [Hubbs] would have received a better result had he been allowed to represent himself.' " (*People v. Hannibal* (2006) 143 Cal.App.4th 1087, 1092 citing *Williams*, *supra*, 110 Cal.App.4th at pp. 1592-1593.) We agree with the People that the abuse of discretion is the proper standard, and if this was the only error in this matter, we would not be likely to reverse the judgment on the record before us. However, as we explain below, because of the multitude of errors in this matter, we discuss the impact of this specific error in the cumulative error section below.

25

# V

## *WAIVER OF JURY TRIAL*

Hubbs maintains the trial court erred by allowing Hubbs's trial counsel to waive his right to a jury trial over his objection. We agree based on the specific facts in the record before us.

### A. Background

On October 19, 2012, at a hearing at which Hubbs was not present, Hubbs's trial counsel waived Hubbs's right to a jury trial. There is no indication in the record that Hubbs consented to this waiver. The court did not inquire about Hubbs's position on the matter, and at this hearing, Hubbs's trial counsel made no representation that Hubbs had consented to the waiver.

At a hearing on December 5, 2012, the attorneys and the court discussed arrangements for the trial given Hubbs's medical problems. These problems effectively prevented Hubbs from traveling to participate in person at trial. As such, the attorneys and court were discussing the possibility of using video conference technology to allow Hubbs to participate in his trial remotely. During the hearing, Hubbs's trial counsel and the court engaged in the following exchange:

> "[Mr. Gass]: One issue that I don't know the answer to is I can waive a jury for Mr. Hubbs over his objection. I don't know that I can agree to a trial over the phone over his objection, and I don't know for sure if he's going to object. I know he objected to anything happening without him either being here or on the phone, but I don't know for sure if he'll say, yeah, let's proceed to trial. I'm happy on the phone.

26

"THE COURT: Oh, I thought your request—I thought we started down this road because Mr. Hubbs wanted the trial to go forward, and he wanted to participate by phone. I thought that was your representation to the court.

"[Mr. Gass]: That's half accurate and half not accurate. If he was going to have a trial, he wants to at least be here by phone. But I'm anticipating that he may say he doesn't want to have a trial if it has to be by phone, but he had not said that to me. He, on one hand is getting older. I've delayed his case for a long time, and I think it benefits him because his recidivism possibilities go down as he gets older. But I'm in the position where he could complain that he hasn't had a trial, and he could complain he wants to have a trial.

"THE COURT: Mr. Gass, it's not often that I would disagree with counsel, but I have to disagree. I believe your representation was you announced ready and requested that your client be allowed to participate by phone. That's the representation you made to the Court. It's only recently since then that you mentioned that you might now have an objection to what I thought was his request in the first place."

The court and Hubbs's counsel did not focus on Hubbs's right to a jury trial during their exchange. Instead, they centered on whether Hubbs would agree to a trial where he would participate by phone. When Hubbs's counsel mentioned his concern that he might not be able to waive jury trial over Hubbs's objection, there was no discussion of the issue. In addition, Hubbs's counsel's comment about waiver over Hubbs's objection was all the more odd because he already had waived Hubbs's right to a jury trial almost two months earlier.

### B. Law and Analysis

SVP commitment proceedings are not criminal cases; they are civil in nature. (*Hubbart v. Superior Court* (1999) 19 Ca1.4th 1138, 1171-1172.) An SVP proceeding is a "special proceeding of a civil nature, because it is neither an action at law nor a suit in

27

equity, but instead is a civil commitment proceeding commenced by petition independently of a pending action." (*People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 988.) In a "special proceeding," the right to a jury trial is generally a matter of legislative grant, and not constitutional right. (*Corder v. Corder* (2007) 41 Cal.4th 644, 656, fn. 7 [state constitutional right to a jury trial not applicable in special proceedings]; *Cornette v. Department of Transp.* (2001) 26 Cal.4th 63, 76; *People v. Rowell* (2005) 133 Cal.App.4th 447, 452 (*Rowell*); *People v. Williams* (2003) 110 Cal.App.4th 1577, 1590 [no constitutional right to trial in civil commitment proceedings].) In an SVP commitment proceeding, section 6603, subdivision (a) provides the defendant with a statutory right to a jury trial.[7]

The People agree that Hubbs had a statutory right to a jury trial, but argue that a person facing an SVP commitment proceeding must demand a jury trial. (§ 6603, subd. (f).) They reason that a valid jury demand in a civil proceeding must be made either "at the time the cause is first set for trial . . . or within five days after notice of setting . . . ." (Code Civ. Proc., § 631, subd. (e)(4).) The People assert that Hubbs failed to timely request a jury trial, and thus, he cannot now contend his attorney improperly waived his right to a jury trial.

---

[7] Hubbs also contends that he has a constitutional right to a jury trial. We note that Hubbs's argument runs counter to existing precedent, but he urges us to reconsider this issue. We decline to do so on the record before us.

28

Hubbs counters that there is no authority indicating Code of Civil Procedure section 631 applies to SVP proceedings. However, we do not need to resolve this dispute here. The court set trial in this matter on May 27, 2011. Although we do not have a transcript of the May 27 hearing, the minutes from this hearing indicate that a jury trial was set. Thus, it appears from the record, that Gass, Hubbs's attorney, requested a jury trial at that point.

Moreover, other portions of the record support the inference that Hubbs's counsel requested a jury trial. On October 19, 2012, Gass waived jury trial. The trial court accepted the waiver. At that point, the prosecution did not argue that Hubbs had never requested a jury trial. As such, on the record before us, it appears that Hubbs or his counsel requested a jury trial, the court set a jury trial, and then Gass later waived the jury trial. Therefore, we conclude a jury trial was timely requested, and now we must address whether Gass's waiver of jury trial without Hubbs's consent and/or over his objection was valid.

The parties concede that no reported decision has addressed the issue presented here. However, at least one court has determined that a defendant in an SVP proceeding does not have to personally waive his right to a jury trial. (See *Rowell*, *supra*, 133 Cal.App.4th at p. 454.)

In *Rowell*, *supra*, 133 Cal.App.4th 447, the defendant objected on appeal to his trial attorney's waiver of his right to a jury trial. Yet, the attorney had filed a written declaration under penalty of perjury stating that the defendant no longer wanted a jury trial. On appeal, the defendant did not argue that the declaration was false or that the

29

attorney was without the actual authority to waive the jury trial. Instead, he claimed that he had the right to make a personal waiver and the attorney's waiver was invalid. (*Id.* at pp. 452-453.) The Court of Appeal rejected this argument concluding that "a defendant's personal waiver of a jury trial in an SVP proceeding is not required, and the trial court properly accepted defense counsel's declaration that the defendant wanted a court trial." (*Id.* at p. 454.)

Although we do not quibble with the holding of *Rowell*, *supra*, 133 Cal.App.4th 447, it is of little help in the instant action. In contrast to the defendant in that case, Hubbs does not claim his statutory right to jury trial can only be personally waived. Further, there is no indication in the record that Hubbs ever consented to a waiver of jury trial or that Gass represented Hubbs had consented to waiver. In fact, the record implies the opposite conclusion: Gass waived Hubbs's right to a jury trial over Hubbs's objection. The holding of *Rowell* therefore does not resolve the issue presented here.

Outside the SVP context, but in other special proceedings, courts have accepted a defendant's counsel's waiver of a jury trial without the defendant's consent or over his objection. For example, a defendant's trial counsel can raise a doubt as to defendant's competency and can even waive a jury trial over a defendant's objection in a competency proceeding. (*People v. Masterson* (1994) 8 Cal.4th 965, 971-973 (*Masterson*). In *Masterson*, after determining that a defendant's right to a jury trial in a competency hearing was statutory not constitutional (*id.* at p. 969), the California Supreme Court reasoned it would make no sense to grant the defendant authority to make basic decisions

30

regarding the conduct of the proceeding because the very competency of the defendant is in question at such a proceeding (*id*. at p. 971).

However, the conclusion in *Masterson* was driven, in part, by the recognition that in proceedings to determine competency to stand trial in a criminal case (ref. Pen. Code, § 1368 et seq.), it is presumed that the person whose competence is in question cannot be entrusted to make basic decisions regarding the conduct of that proceeding. (*Masterson*, *supra*, 8 Cal.4th at p. 974.) Civil commitments under the SVPA do not necessarily involve individuals whose competence is in question, so, absent anything in the record showing there was some question as to Hubbs's competence to make decisions regarding his defense, we cannot extend the holding of *Masterson* to the issue before us. As neither party has pointed to Hubbs's competence being at issue, beyond the mental illness of pedophilia, we find no indication in the record that would support application of *Masterson*, *supra*, 8 Cal.4th 965 here.

Courts also have addressed jury waiver issues in commitment proceedings involving MDOs and defendants found not guilty by reason of insanity (NGI). In *People v. Otis* (1999) 70 Cal.App.4th 1174 (*Otis*), the court dealt with Penal Code section 2966, subdivision (b), which requires a jury trial when a person challenges his or her MDO status unless the jury is "waived by both the person and the district attorney." There, counsel waived a jury trial. The defendant objected and requested a jury trial, but at the time, he was delusional and said he was being sexually assaulted by invisible police. The court denied the request. (*Id*. at pp. 1175-1176.)

31

In upholding counsel's waiver, the court found that "nothing in the requirement that the waiver must be by 'the person' precludes the person's attorney from acting on his behalf" and noted that "[t]he Legislature did not say the waiver had to be made 'personally.' " (*Otis*, *supra*, 70 Cal.App.4th at p. 1176.) The court opined that if the Legislature had intended to require a personal waiver, it would have made its intent clear and unambiguous. (*Ibid*.)

The court further explained that Penal Code "[s]ection 2966 concerns persons who have been found by the Board of Prison Terms to be mentally disordered. The Legislature must have contemplated that many persons, such as Otis, might not be sufficiently competent to determine their own best interests. There is no reason to believe the Legislature intended to leave the decision on whether trial should be before the court or a jury in the hands of such a person." (*Otis*, *supra*, 70 Cal.App.4th at p. 1177.)

In *People v. Montoya* (2001) 86 Cal.App.4th 825, the court reached the same conclusion concerning identical language in Penal Code section 2972, subdivision (a), which requires a jury trial on an MDO commitment extension unless waived "by both the person and the district attorney." There too, counsel waived a jury. (*Montoya*, *supra*, at pp. 828-829.)

The court concluded that the constitutional waiver requirements in criminal cases were inapplicable because a commitment trial is fundamentally a civil proceeding. (*Montoya*, *supra*, 86 Cal.App.4th at pp. 829-830.) The court further observed that in civil actions, where there is a state constitutional right to a jury trial, and in ancillary criminal

proceedings, where the right to a jury trial is statutory, not constitutional, a jury trial can be waived by either the client or counsel. (*Ibid.*) Accordingly, the court looked to the waiver provision to see if it permitted or prohibited counsel to waive. (*Id.* at p. 830.)

In upholding counsel's waiver, the court followed *Otis*, *supra*, 70 Cal.App.4th 1174. It too noted that the statutory language did not expressly require a personal waiver or clearly preclude a waiver by counsel and agreed that the Legislature could not have intended to require a personal waiver and thereby deny counsel the authority to act on behalf of an incompetent MDO such as the MDO in *Otis*. (*Montoya*, *supra*, 86 Cal.App.4th at pp. 830-831.)

The court acknowledged that "a patient might be mentally disordered for some purposes and not for others." (*Montoya*, s*upra*, 86 Cal.App.4th at p. 831.) However, it noted that the defendant's mind was not functioning normally (he was diagnosed with schizophrenia), and he had repeatedly and recently demonstrated poor judgment and aberrant behavior. In upholding counsel's waiver, the court found "no reason to believe that defendant was capable of making a reasoned decision about the relative benefits of a civil jury trial compared to a civil bench trial." (*Ibid.*)

In *People v. Powell* (2004) 114 Cal.App.4th 1153 (*Powell*), the defendant, who was found NGI, objected to counsel's waiver, and requested a jury. When the court denied the request, the defendant became so argumentative, belligerent, and disruptive that he had to be removed from the courtroom. On appeal, the defendant claimed that counsel's waiver was ineffective because Penal Code section 1026.5, subdivision (b)(4) required his personal waiver. (*Powell*, *supra*, at pp. 1157-1158.)

33

In rejecting this claim, the court cited *Otis*, *supra*, 70 Cal.App.4th 1174 and noted that "[t]he Legislature, in enacting [Penal Code] section 1026.5, did not say that the jury waiver must be 'personally' made by the NGI committee." (*Powell*, *supra*, 114 Cal.App.4th at p. 1159.) Moreover, mirroring the *Otis* court's view concerning incompetent persons, the court opined generally that "[a]n insane person who is 'a substantial danger of physical harm to others' [citation] should not be able to veto the informed tactical decision of counsel." (*Id.* at p. 1158.) The court pointed out that the defendant had been found insane twice, medical staff had diagnosed him with paranoid schizophrenia, and there was no evidence he had regained his sanity. The court further noted that the defendant had a history of violence, believed certain people should be killed, and sought release to do so. (*Ibid.*) The court asked, "Can such a person intelligently invoke or waive the right to a jury trial? Is such a person competent to meaningfully understand who should make the determination of whether his commitment should be extended?" (*Ibid.*) The court answered, "Common sense dictates that appellant should not be able to veto his attorney's decision to waive a jury. The record demonstrates that appellant was suffering from a severe mental disorder. On the day of the purported demand for jury, appellant was medicated, experiencing mood swings, and was so belligerent and disruptive that he had to be removed from the courtroom." (*Ibid.*)

In addition to *Masterson*, *supra*, 8 Cal.4th 965, the People here rely on *Montoya*, *supra*, 86 Cal.App.4th 825 and *Powell*, *supra*, 114 Cal.App.4th 1153, and to a more limited extent, *Otis*, *supra*, 70 Cal.App.4th 1174. However, *Otis*, *Montoya*, and *Powell*

34

must be viewed in light of their particular facts and the issues raised in them.[8]  (See

*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 ["[l]anguage used in any opinion is of

course to be understood in the light of the facts and the issue then before the court"].)  As

noted, in *Otis*, the defendant was delusional, and the court upheld counsel's jury waiver

over the defendant's objection, opining that the defendant was not capable of making a

reasoned decision.  (*Otis*, *supra*, 70 Cal.App.4th at pp. 1175-1176.)  In *Montoya*, the

court also upheld counsel's waiver, noting that the defendant's mind was not functioning

normally, and he, like the defendant in *Otis*, was not capable of making a reasoned

decision.  (*Montoya*, *supra*, 86 Cal.App.4th at p. 831.)  Likewise, the court in *Powell*

upheld counsel's waiver over the defendant's objection because the defendant was

medicated and his disruptive conduct demonstrated his incompetence.  (*Powell*, *supra*,

114 Cal.App.4th at p. 1158.)

Given the particular facts concerning the mental state of these defendants, we read

these cases for the proposition that when it reasonably appears that an MDO or defendant

who is NGI is incapable of determining whether a bench or jury trial is in his or her best

interests, he or she must act through counsel, and counsel has exclusive authority to

decide even over an objection.  We do not read these cases more broadly to hold that

counsel controls the jury issue in an SVP proceeding, regardless of whether the defendant

8       We are mindful that two cases pending before the California Supreme Court
(*People v. Blackburn*, S211078; and *People v. Tran*, S211329) may impact the
precedential value of *Otis*, *supra*, 70 Cal.App.4th 1174; *Montoya*, *supra*, 86 Cal.App.4th
825 and *Powell*, *supra*, 114 Cal.App.4th 1153.  However, at this time, these three cases
remain good law and we apply them here accordingly.

is incompetent.  Simply put, there is a difference between the respective mental states of the defendants in *Otis*, *Montoya*, and *Powell* on the one hand and Hubbs on the other.  Although the record indicates that Hubbs can be a difficult client and often argues with the court, we find nothing in the record implying Hubbs was incapable of determining whether a bench or jury trial was in his best interest.  Indeed, such an argument was never made at trial or on appeal.

Citing *People v. Barrett* (2012) 54 Cal.4th 1081 (*Barrett*), the People argue that a distinction between Hubbs's mental capability and the respective mental capabilities of the defendants in *Otis*, *Montoya*, and *Powel* does not matter.  We do not read *Barrett* as determining this issue.

In *Barrett*, *supra*, 54 Cal.4th 1081, the Supreme Court concluded counsel had exclusive control in a proceeding to commit a mentally retarded person who is dangerous under section 6500.  In that case, the court conducted a bench trial and committed the defendant.  (*Barrett*, *supra*, at pp. 1088-1092.)  On appeal, she claimed that the federal Constitution provided the right to a jury trial and required a jury advisement and personal waiver.  (*Id*. at p. 1093.)  Although the statute did not provide the right to a jury trial, the Supreme Court agreed that constitutional considerations warranted recognizing an implied statutory right to a jury trial.  (*Id*. at pp. 1097, 1100.)  However, the court rejected advisement and waiver requirements because it found that counsel had exclusive control over whether to have a jury trial.  In reaching this conclusion, the court relied primarily on *Masterson*, *supra*, 8 Cal.4th 825.

The court explained that mental retardation is a developmental disability that originates when an individual is a minor and continues, or can be expected to continue, indefinitely, and constitutes a " 'substantial disability for that individual.' " (*Barrett*, *supra*, 54 Cal.4th at p. 1103.) Moreover, for purposes of a commitment under section 6500, mental retardation involves " ' " 'significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior,' and appearing in the 'developmental period.' " ' [Citations.]" (*Ibid*., italics omitted.) The court opined that "the significant cognitive and intellectual deficits that the condition entails, which appear early in life and never recede, affect the ability to 'make basic decisions' regarding the conduct of the section 6500 proceeding. [Citation.] Such an individual thus plays a limited 'personal role' in the case, and must rely on counsel to decide all tactical and procedural matters, such as whether to exercise the jury trial right." (*Id*. at pp. 1103-1104.)

The court rejected a claim that this approach "improperly 'presumes' that a person is mentally retarded before the fact finder has decided the issue." (*Barrett*, *supra*, 54 Cal.4th at p. 1104.) The court noted that a commitment petition is filed at the request of "a responsible and interested party (e.g., parent, conservator, correctional or probation official, or regional center director), who presents specific information (reasons) for supposing that the person is mentally retarded and dangerous, in need of treatment, and eligible for commitment. The significance of this request, and its role in providing a foundation for the petition and commitment process, is underscored by the verification requirement. (§ 6502.) . . . [¶] Second, where a section 6500 petition is filed, the trial

37

court is entitled to a written report prepared by, or at the behest of, the director of the regional center, following an examination of the alleged mentally retarded person. (§ 6504.5.)  Regional centers specialize in assessing and assisting mentally retarded and other developmentally disabled persons on an individual basis.  [Citation.]  Thus, the regional center report obviously serves as a professional pretrial evaluation of the person's history, condition, and behavior, and includes informed recommendations on treatment and placement, including any interim placement pending the hearing. . . . [¶]  In light of these principles and authorities, we conclude that someone like Barrett, who is alleged to be mentally retarded and dangerous under section 6500, is not in a position to personally assert or waive the right to jury trial, to sufficiently comprehend the jury trial advisement, or to override the views of counsel on the subject.  Sole control over such tactical and procedural decisions rests with counsel, whether or not the client has been consulted or objects."  (*Barrett*, *supra*, at pp. 1104-1105.)

*Barrett* can be read with *Masterson* to establish that in certain types of commitment proceedings, the defendant's alleged mental state—e.g., incompetency and mental retardation—disables him or her from making reasoned decisions about what is in his or her best interests, including whether to request or waive a jury trial.  Put differently, it is reasonable to categorically assume that such defendants lack the capacity to make a rational decision about a jury trial.  Accordingly, they must act through counsel, and counsel has exclusive control over the jury issue.  Nevertheless, we do not read these cases to hold that defense counsel controlled the jury issue here in an SVP proceeding regardless of Hubbs's mental capabilities.  Nor do we read *Barrett* to render

Hubbs's capability of determining whether a bench or jury trial was in his best interest irrelevant.

In short, we read nothing in *Barrett* or *Matterson* (or *Otis*, *Montoya*, or *Powell* for that matter) that creates a bright line rule in an SVP proceeding that, simply because of the nature of the proceeding, and the possibility that the defendant is suffering from the mental illness pedophilia, defense counsel absolutely controls the right to jury trial over the defendant's objection. This said, we are mindful that there may be situations in an SVP proceeding where a defendant lacks the capacity to make a reasonable decision about whether to have a jury or bench trial. This is not that case. In addition, we do not discard the possibility that a jury waiver may be appropriate over the objection of a defendant in an SVP proceeding if the waiver is a tactical decision of defense counsel, depending on the circumstances of the specific case. Again, the record in this case does not allow us to address this issue to create a general rule that applies beyond the specific facts of this case.

There is no indication that Hubbs was incapable of determining whether a bench or jury trial was in his best interest. The People do not make such an argument in their respondent's brief, and neither the prosecution nor Hubbs's counsel raised this issue with the trial court. And the record is silent as to why Hubbs's counsel waived jury trial. With virtually no discussion, Hubbs's counsel and the prosecution waived jury trial on October 19, 2012. Curiously, almost two months later, when discussing the logistics of trial considering Hubbs's medical issues and inability to travel, Hubbs's counsel exhibited concern that he might not be able to waive a jury trial over his client's objection. This

39

issue was never probed by the trial court despite the fact that Hubbs used his attorney's jury trial waiver as grounds to support his *Marsden* motion. Simply put, on the record before us, it is not clear that Gass waived jury trial for any tactical purpose to benefit Hubbs whatsoever.[9] Instead, as best as it can be implied from the record, it appears Hubbs's counsel did so either for his convenience or the court's convenience.

Based on the specific facts before us here, we conclude that the trial court erred in accepting Hubbs's counsel's waiver of jury trial without any indication that Hubbs consented to the waiver or Hubbs was incapable of determining whether a bench or jury trial was in his best interest. The People argue that any error would be harmless. We discuss this error in the cumulative error section below.

VI

*CUMULATIVE ERROR*

Hubbs contends that even if no individual errors were prejudicial alone, the cumulative effect of multiple errors require reversal. When a defendant claims cumulative error the "test is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.) "[W]e review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid.*) The

---

[9]    Ostensibly, it could make sense that Gass waived jury trial because he thought a bench trial would better serve Hubbs if Hubbs was not going to be present in person at the trial. However, Gass's questioning of whether he could waive jury trial over his client's objection when the parties and court were discussing the logistics of a trial because Hubbs could not travel belies that notion.

40

cumulative effect of the errors discussed *ante*—the failure to conduct a proper hearing on the *Marsden* motion, the court informing Hubbs that he was prohibited by California law from representing himself, and the waiver of jury trial without Hubbs's consent and/or over his objection—require reversal.

This is one of those rare cases where, simply put, too much went wrong, undermining our confidence that Hubbs received a fair trial. The court did not sufficiently explore Hubbs's complaints about Gass in the *Marsden* motion. It did not allow Hubbs to discuss all his complaints. The court did not have Gass respond to all the complaints. The court appeared to ignore the substance of Hubbs's written motion. And, most egregiously, the court appears to have predetermined the result and did not provide a sufficient amount of time for the hearing.

In addition, the court incorrectly told Hubbs twice that he was prohibited from representing himself. These incorrect statements of the law colored Hubbs's interactions with the court and his counsel. He wanted to represent himself. He was entitled to do so. (See *Williams*, *supra*, 110 Cal.App.4th at p. 1591.) The court would not permit him to do so. Perhaps if the court had permitted Hubbs to represent himself, he would have been able to retain an expert or would not have waived jury trial. We cannot answer these questions because the trial court erred in informing Hubbs he could not represent himself and never appropriately considered Hubbs's request.

The trial court also erred in allowing Gass to waive jury trial. There is no indication in the record that Hubbs lacked the capacity to determine whether a jury or bench trial would be in his best interest. Hubbs did not consent to the waiver. And there is nothing in the record showing that the waiver was the product of Gass's trial strategy.

Added to these three errors are other issues before and during trial that cause us to question the fairness of the trial here. Although we were unable to determine that Gass was constitutionally ineffective, we remain very concerned that Gass did not retain an expert despite his representations to the court that he had consulted with multiple experts. Also, we do not discount the fact that it took over six years after the original, current petition was filed to get the matter to trial.

We understand that Hubbs was convicted of odious crimes. We appreciate that he does not come across as a pleasant person in the record. Yet, despite Hubbs's flaws, he is still entitled to a proper SVP proceeding. He did not receive one here. This case is an example of the wheels of justice falling off the track and never quite being able to get back on. Hubbs was a 68-year-old man at the time of his most recent trial who has been confined as an SVP since 2006 after serving his prison sentence. Considering the errors discussed above as well as other irregularities in the record, we cannot be confident that it is reasonably probable the jury would not have reached a result more favorable to Hubbs in their absence. (See *People v. Kronemyer*, *supra*, 189 Cal.App.3d at p. 349.)

DISPOSITION

The judgment is reversed.

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

McDONALD, J.